Michael J. GALLAGHER, Plaintiff,

v.

Henry E. CATTO, Defendant.

Civ. A. No. 90–1145 (CRR).

United States District Court, District of Columbia.

Dec. 9, 1991.

missed for lack of subject matter jurisdiction. *See* Federal Defendants' Motion to Dismiss at 2–4.

**572**

Francis R. Ridley, Jr. and Woodley B. Osborne, Jr. of Hanna Gaspar & Osbourne, Washington, D.C., for plaintiff.

Jay B. Stephens, U.S. Atty., and John D. Bates, William Dempster and Daniel J. Standish, Asst. U.S. Attys., District of Columbia, Washington, D.C., for defendant.

CHARLES R. RICHEY, District Judge.

Plaintiff Michael J. Gallagher, formerly a GS–1084–12 Visual Information Specialist at the Defendant United States Information Agency ("USIA"), challenges his November 3, 1989 removal from the federal service, alleging that the Defendant failed to accommodate his handicapping condition of alcoholism as required by the Rehabilitation Act of 1973, as amended, 29 U.S.C. §§ 791 and 794(a), and the Civil Service Reform Act, 5 U.S.C. § 2302(b)(1)(D).[1] Plaintiff seeks reinstatement to the same or a comparable job, full back pay and other accrued benefits, as well as expungement of all records related to disciplinary actions taken as a result of his handicapping condition. Upon consideration of the proposed findings of fact and conclusions of law submitted by the parties, the arguments presented on November 13, 1991, the record herein, and the applicable law, the Court shall enter judgment on the merits for the Defendant.[2] This Opinion shall constitute the Court's findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52.

## I. BACKGROUND

Plaintiff was employed by the Defendant USIA for 24 years, beginning his career as an entry-level typist and working his way through the ranks to become a Visual Information Specialist at the GS–12 level. By all accounts, Plaintiff's performance, when he was not under the influence of alcohol, was, at the very least, satisfactory.

Although employees at the agency suspected the Plaintiff's drinking problem as early as 1974, Plaintiff's drinking did not interfere with his job performance at that time. *See, e.g.,* Deposition of Sandra Greenberg at 17–21; Deposition of Ronald Fett at 12. No one contacted the personnel office or the agency's Advisory, Referral and Counseling Service ("ARCS"). Greenberg Dep., *supra;* Fett Dep., *supra.* However, to his credit, Plaintiff, on his own initiative, visited the USIA nurse to discuss his drinking problem sometime in the 1978–1979 period. The nurse referred Plaintiff to the State Department's medical section, where doctors discovered damage induced by alcoholism. Gallagher Dep. (Vol. I) at 49. Heeding the recommendation of the State Department physicians, Plaintiff visited Mr. Hal Marley, an alcoholism counselor, who encouraged Plaintiff to attend Alcoholics Anonymous ("AA"). *Id.* Plaintiff attended AA "off and on." *Id.* at 53–4, 58. Plaintiff began the debilitating pattern of drinking and detoxification programs at this time.

In 1981, Plaintiff informed his supervisor, Ronald Fett, of his struggle with the disease. *See* Gallagher Dep. (Vol. I.) at 61.

---

1. At the November 13, 1991 status conference, Plaintiff's counsel explained that the alleged violation of the Civil Service Reform Act is predicated on a finding that the agency failed to meet its responsibilities under the Rehabilitation Act.

2. At the November 13, 1991 Status Conference, the parties agreed to withdraw their respective Motions for Summary Judgment and decided to submit this matter for a decision on the merits, without a trial, on the basis of the record herein pursuant to Fed.R.Civ.P. 65. *See* Order, *Gallagher v. Catto,* 778 F.Supp. 570 (D.D.C.1991).

Plaintiff showed Mr. Fett a pamphlet detailing the 28–day program for alcoholics at Melwood Farms. Gallagher Dep. at 62. According to Plaintiff's deposition testimony, Mr. Fett was "very supportive" of the program and approved sick leave for the 28–day treatment. *Id.* at 61–64. Plaintiff successfully completed the Melwood Farms program and remained sober until the end of 1982. During this period of sobriety, Plaintiff met with ARCS counselors James Wilcox and Terri York and, on his own initiative and with their encouragement, attended AA meetings at the Department of State and at USIA. Gallagher Dep. at 64–70.

Unfortunately, in late 1982, Plaintiff embarked on a series of drinking binges followed by detoxification programs. He was admitted for detoxification at Suburban Hospital three times during the late 1982–1984 period. Plaintiff was afforded sick leave for each of these programs. *Id.* at 71–77. In early January of 1985, Plaintiff entered another 28–day detoxification program at Arlington Hospital. *Id.* at 80. The agency again approved sick leave. *Id.* Plaintiff entered an aftercare program at Arlington Hospital and volunteered in the detoxification unit. *Id.* at 84–86. The ARCS counselors monitored Plaintiff's progress. *Id.* at 87. Plaintiff remained sober for approximately two years.

Plaintiff began drinking again in 1986, culminating in another hospital admission for detoxification in April of 1987. *Id.* at 90. Plaintiff intensified his counseling sessions with Dr. Wilcox and continued attending AA. *Id.* at 91–92. Also at this time, Plaintiff received treatment for depression at Fairfax Hospital. *Id.* at 94. Plaintiff maintained sobriety for only a short interval, however, and was again admitted for detoxification in 1987, receiving approval for leave time from the agency. *Id.* at 98–99. In toto, the agency afforded Plaintiff a substantial amount of sick leave during the 1985–1987 time period. It is undisputed that the Plaintiff took four weeks and 1 day of sick leave in 1985; three weeks and one day of sick leave in 1986; and over two weeks of sick leave in 1987. *See* Exhibit 4, Defendant's Motion for Summary Judgment.

In October of 1987, Mr. Fett recommended a short suspension for Plaintiff's sleeping on the job and three hours' unauthorized absence without leave. *See* Dep. of Patricia Hoxie Noble at 14. *See also* October 28, 1987 Memorandum from R. Fett to P. Hoxie, Exhibit 6, Defendant's Motion for Summary Judgment. When confronted by Mr. Fett, Plaintiff acknowledged that his drinking had interfered with his job performance. Consequently, on November 18, 1987, Ms. Hoxie[3] proposed a ten day suspension, giving Plaintiff ten days within which to respond. *See* Exhibit 7, Defendant's Motion for Summary Judgment.

Plaintiff then met with the Director of Personnel at USIA, Mr. Harlan Rosaker, to explain his alcohol problem. Mr. Rosaker and Plaintiff agreed to hold the proposed suspension in abeyance, provided that Plaintiff participate in an intensive rehabilitation program for 10 months. Under this "firm choice" agreement, which was memorialized,[4] Plaintiff promised to maintain daily contact with his AA mentor, attend AA two times per week and meet with an ARCS counselor weekly. The firm choice agreement also subjected the Plaintiff's leave time, punctuality and work habits to closer scrutiny. *Id.*

Although there is some dispute between the parties as to Plaintiff's compliance with the firm choice agreement, it is undisputed that Plaintiff made at least "one slip" during the period covered by the firm choice agreement.[5] *See* Dep. of Dr. James Wilcox

---

3. At the time of the incidents related herein, Ms. Patricia Hoxie was the Chief of Domestic Personnel. Ms. Hoxie subsequently changed her name to Ms. Patricia Hoxie Noble. For ease of reference, the Court will use "Ms. Hoxie" throughout this Opinion.

4. *See* Plaintiff's Exhibit 7.

5. Defendant emphasizes Plaintiff's deposition testimony regarding two hospitalizations for detoxification—in April and July of 1988. *See* Gallagher Dep. at 111–115. Based on the parties' marked-up versions of the Proposed Findings of Fact and Conclusions of Law, Plaintiff admits to only the April event. *See* Plaintiff's

at 46, at Exhibit 11 of Defendant's Motion for Summary Judgment. Despite this slip, Dr. Wilcox testified that Plaintiff was "very motivated" to successfully complete the firm choice agreement. *Id.* Plaintiff believes that he informed his supervisor of his brief relapse. Gallagher Dep. at 113–115.

At the close of the 10–month firm choice agreement, Mr. Fett recommended that the proposed suspension be removed from Plaintiff's records. *See* Plaintiff's Exhibit 8, October 24, 1988 Memorandum from Mr. Fett to Ms. Hoxie. Mr. Fett concluded that Plaintiff "made substantial progress" and "is determined to overcome [his alcoholism]." *Id.* The agency removed the proposed suspension on the same day. *See* Plaintiff's Exhibit 9. The Plaintiff was advised, however, "the progress toward permanent rehabilitation which you have made during the past ten months must be sustained in the future if you are to avoid disciplinary action." *Id.*

Plaintiff began binge drinking approximately two months after the firm choice agreement expired. Gallagher Dep. at 118–120. One of Plaintiff's co-workers drove him to Fairfax Hospital where Plaintiff underwent detoxification for one week. *Id.* at 124–25. Plaintiff's condition worsened in early 1989. Although Plaintiff disputes the Defendant's characterization of events, the record indicates that Plaintiff's alcohol consumption was interfering with his work. *See* Exhibit 16, Defendant's Motion for Summary Judgment, March 28, 1989 Memorandum from Ms. Greenberg to Ms. Twardowski (failure to follow instructions on dealing with Berlin office); Exhibit 17, Defendant's Motion for Summary Judgment, Affidavit of Mr. Canning (testifying to Plaintiff "lying on top of his desk in mid-afternoon ... apparently ill and in no condition to work").

On March 28, 1989, Plaintiff reported to work under the influence of alcohol. Co-workers transported Plaintiff to Arlington Hospital for detoxification and treatment for alcoholism. *See* Gallagher dep. at 126–132. After brief visits to the hospital, Plaintiff reentered Arlington hospital for another 28–day program. Agency personnel went to Arlington Hospital to meet with the Plaintiff. *See* Wilcox Dep. at 54–56. At this time, the agency personnel discussed the proposed treatment and aftercare program with Plaintiff's counselor at Arlington Hospital. *See* Exhibit 18, Defendant's Motion for Summary Judgment, April 21, 1989 Memorandum to the Files from Ms. Twardowski. The agency personnel then reminded Plaintiff that, under the terms of the continuing supervision implicit in his prior "Firm Choice Agreement," the agency was giving him one "last chance" to embark on a course which would allow him to maintain his sobriety. *Id.*[6] Plaintiff acknowledges that, despite the fact that he was hospitalized at the time, he understood the proposal and agreed to its terms. *See* Gallagher Dep. (Vol. II) at 8–9.

Upon completing the detoxification program, Plaintiff enrolled in the recommended aftercare program at Arlington Hospital. *See* Exhibit 43, Defendant's Motion for Summary Judgment. Because of a relapse, Plaintiff resumed drinking and did not attend the required sessions. Accordingly, Plaintiff was terminated from the aftercare program. *See* Gallagher dep. (Vol. II) at 13–15. *See also* Exhibit 43, Defendant's Motion for Summary Judgment. According to both Dr. Wilcox and the Plaintiff, this relapse was an especially traumatic event. *See* Wilcox Dep. at 57–58; Gallagher Dep. (Vol. II) at 2–15 (noting that Plaintiff had completely lost all ability to control himself). The agency's records indicate that the Plaintiff had taken 8 weeks of sick leave during this January–May 1989 period. *See* Exhibit 4, Defendant's Motion for Summary Judgment.

Plaintiff's condition continued to deteriorate in June and July of 1989. Plaintiff's supervisor, Mr. Fett, detailed Plaintiff's numerous requests for leave in late June. *See* Memorandum from Mr. Fett to Ms.

Mark–Up of Defendant's Proposed Findings of Fact and Conclusions of Law at 10.

6. Unlike the firm choice agreement, this "last chance" agreement was not formally reduced to writing.

Twardowski, July 27, 1989, Exhibit 19 to Defendant's Motion for Summary Judgment. On July 10, 1989, Plaintiff called his supervisor from Ocean City, Maryland, and advised that he missed a doctor's appointment and an interview for possible admission to the Oxford House facility. *Id.* Plaintiff also indicated that he was experiencing suicidal tendencies. *Id.* When Plaintiff called the office on the next day, Mr. Fett advised him that he was on AWOL status until he returned to the office or sought treatment. *Id.* Plaintiff indicated to Mr. Fett that some absences were related to necessary psychiatric treatment, in addition to his alcoholism. *Id.*

Recognizing the severity of the Plaintiff's addiction, Dr. Wilcox referred Plaintiff to Dr. Wynne, a clinical psychologist specializing in the diagnosis and treatment of alcohol addiction. *See* Wilcox Dep. at 58. Dr. Wynne in turn referred Plaintiff to Dr. Voith, an internist with a specialty in dealing with alcoholic patients. *See* Deposition of Dr. Ronald D. Wynne at 32–39. Plaintiff entered a detoxification program at Sibley Hospital in July of 1989. All of the physicians agreed that Plaintiff needed intensive long-term treatment. *See* Wilcox Dep. at 58–60. According to Ms. Hoxie, the agency would have granted extended sick leave to the Plaintiff had he pursued long-term care. *See* Hoxie Dep. at 53–54.

According to Mr. Michael Canning, one of Plaintiff's co-workers, Plaintiff arrived at work in an inebriated state on August 4, 1989. *See* Exhibit 23, Defendant's Motion for Summary Judgment. Plaintiff denied that he was inebriated at this time, claiming that he was experiencing difficulty due to illness and prescription drugs. *Id.* Dr. Wilcox, along with Ms. Twardowski and Mr. Canning, met with Plaintiff and advised him "that he should not report to work intoxicated, and that as far as we were concerned, that the alternative he had was to seek long-term medical treatment, or to be on AWOL." *See* Twardowski Dep. at 107, Exhibit DD to Defendant's Reply to Plaintiff's Opposition to Defendant's Motion for Summary Judgment. According to Mr. Canning, Dr. Wilcox "advised him to get long-term medical help for his condition

and consulted with one hospital on the phone toward that end." Exhibit 23. However, Dr. Wilcox noted that he "was not acting on behalf of management in referring him to treatment programs ... [it] was my way of thinking at that time that [Plaintiff] was already being processed out." Wilcox Dep. at 62–63, Exhibit C, Defendant's Opposition to Plaintiff's Motion for Summary Judgment. The agency asked the Plaintiff to provide documentation of "a prognosis, a diagnosis [and] a treatment plan." Twardowski Dep. at 129–130.

In early August, Plaintiff was admitted to the detoxification unit at Montgomery Hospital. *See* Exhibit 28, Discharge Summary, Montgomery General Hospital, Defendant's Motion for Summary Judgment. Not surprisingly, this detoxification program did not alleviate Plaintiff's addiction, and he returned to Montgomery Hospital during August 8–13, 1989. *Id.* The staff at Montgomery Hospital advised Plaintiff to undertake a long-term placement in a residential protective setting, and investigated plans for long-term placement in a residential setting. *See* Gallagher Dep. (Vol. II) at 50. *See also* Exhibit 28 (also noting that Plaintiff "planned to enter an outpatient rehabilitation program upon discharge").

During this turbulent August time period, the agency reassigned Plaintiff to the USIA's Exhibits Branch. Twardowski Dep. 109. According to the agency, this transfer would give the Plaintiff a fresh start, and would also satisfy many of Plaintiff's co-workers in the Visual Services Branch, who had lodged complaints about Plaintiff's disruptive behavior. *Id.* Plaintiff's detail at the Exhibits Branch was not successful. Allegations surfaced that Plaintiff committed a serious error in destroying classified documents without authorization. *See* August 7, 1989 Memorandum from Ms. Greenberg to Ms. Twardowski, Exhibit 24, Defendant's Motion for Summary Judgment. This incident resulted in the suspension of Plaintiff's security clearance on August 10, 1989. *See* Exhibit 26, Defendant's Motion for Summary Judg-

ment. Moreover, Plaintiff's supervisor at the Exhibits Branch, Ms. Becker, detailed numerous deficiencies in the Plaintiff's work and claimed that she needed to hire an independent photo researcher to complete the assigned work. *See* Affidavit of Gail Becker, Exhibit 27, Defendant's Motion for Summary Judgment.

Plaintiff arrived at work on August 30, 1989 intoxicated. *See* Exhibit 27 at 3. Plaintiff checked into the Psychiatric Institute of Washington on the next day. *Id.* Plaintiff returned to work on September 11, 1989, again intoxicated. *Id.* Ms. Becker sent Plaintiff home. Plaintiff refused a taxicab, and indicated that he would travel by bus. *Id.* On September 1, 1989, Mr. Fett proposed disciplinary action, including termination, due to Plaintiff's frequent AWOL periods and breach of the agreement made at Arlington Hospital in April. *See* Exhibit 29, Defendant's Motion for Summary Judgment. The agency adopted Mr. Fett's recommendation, and proposed termination. *See* September 15, 1989 Letter from Ms. Hoxie to Plaintiff, Exhibit 30, Defendant's Motion for Summary Judgment.

Plaintiff called Ms. Twardowski on September 20, 1989, and informed her that he had " 'escaped to Florida' because his wife was going to have him arrested." *See* Exhibit 33 to Defendant's Motion for Summary Judgment, September 20, 1989 Memorandum to the Files from Ms. Twardowski. Ms. Twardowski advised Plaintiff that he

> continued to be on AWOL, [and] that he had failed to provide any excuse for his absence and that consideration for approval of sick leave for long-term treatment would only be given if he provided something in writing from his medical advisors.

*Id.* Ms. Twardowski reminded Plaintiff to respond to the proposed termination. *Id.*

Plaintiff advised Ms. Twardowski that he would soon enter a program at the National Institute of Health (NIH). *Id.* On October 20, 1989, the Director of Personnel, Mr. Rosaker, contacted Plaintiff—now at NIH—seeking a response to the proposed termination. *See* Exhibit 34, Defendant's

Motion for Summary Judgment. When Plaintiff finally responded to the proposed termination, he admitted all of the charges and advised that he would participate in a supervised apartment program in Fairfax, Virginia. *See* Plaintiff's October 25, 1989 Letter to Mr. Rosaker, Exhibit 35, Defendant's Motion for Summary Judgment. Plaintiff's doctor at NIH, Dr. Schmitz, informed the agency that Plaintiff "has been refractory to treatment for his primary condition of alcohol dependence" and concluded that "an extended program would best meet [Plaintiff's] present needs." *See* Exhibit 36, Defendant's Motion for Summary Judgment. Dr. Schmitz also noted that Plaintiff "is motivated for treatment and is very intelligent." *Id.*

The USIA could not verify that Plaintiff had entered the supervised apartment program as of October 30, 1989. *See* October 31, 1991 Letter from Mr. Rosaker to Plaintiff, Exhibit 37, Defendant's Motion for Summary Judgment. Prior to terminating Plaintiff, the agency offered Plaintiff the opportunity to use his sick leave for an extended treatment program and then resign, without any mention of a termination in his record. *See* Rosaker Dep. at 68–69. Plaintiff refused this option. *Id.* The agency also counseled Plaintiff as to the availability of disability retirement. *See* Hoxie Dep., Exhibit 44 to Defendant's Motion for Summary Judgment. Having attempted some resolution short of termination, Plaintiff was removed from his position at USIA and from the federal service, effective November 3, 1989. *See* Exhibit 37, Defendant's Motion for Summary Judgment.

After his termination from the agency, the Plaintiff experienced great turmoil. He entered detoxification programs in November of 1989 and in January of 1990. *See* Gallagher Dep. (Vol. I) at 31. Plaintiff also participated in Father Martin Ashley's program in the Spring of 1991. *Id.* at 42–44. Upon completing this program, Plaintiff became a resident at a Salvation Army Rehabilitation Center, where he attended AA meetings. Plaintiff has been sober since November of 1990. *See* Plaintiff's

Opposition to Defendant's Motion for Summary Judgment at 1.

## II. ANALYSIS

 Alcoholism is a handicapping condition within the purview of the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 791, *et seq. See Whitlock v. Donovan*, 598 F.Supp. 126, 129 (D.D.C.1984), *aff'd sub nom. Whitlock v. Brock*, 790 F.2d 964 (D.C.Cir.1986); *Fuller v. Frank*, 916 F.2d 558, 561 (9th Cir.1990); *Rodgers v. Lehman*, 869 F.2d 253 (4th Cir.1989). Pursuant to the Rehabilitation Act, federal agencies must endeavor to promote "hiring, placement and advancement of individuals with handicaps." 29 U.S.C. § 791(b). The Equal Employment Opportunity Commission ("EEOC") has promulgated regulations to guide agencies in implementing the Rehabilitation Act. Under these regulations, agencies must

> make reasonable accommodation to the known physical or mental limitations of a qualified handicapped applicant or employee unless the agency can demonstrate that the accommodation would impose an undue hardship on the operation of its program.

29 C.F.R. § 1613.704(a) (1991).[7]

 In *Whitlock v. Donovan, supra*, 598 F.Supp. at 133–34, Judge Gesell formulated a guideline for agencies charged with providing "reasonable accommodation" to employees suffering from the disease of alcoholism. "[W]hen an employee's performance deficiencies are suspected to be due to alcohol," the agency must first offer counseling. *Id.* at 133. If the employee rebuffs the offer and if discipline is war-

ranted, the agency should impose a "firm choice" between treatment and discipline. Although the agency should follow through on its firm choice agreements, the agency must recognize that relapse is common. Accordingly, the agency "is not justified in automatically giving up on an employee who enters treatment, but who subsequently relapses." *Id.* at 134. The agency should consider discipline short of removal. If this discipline fails and if removal appears to be the only viable option, the agency must evaluate, prior to removing the employee, whether "keeping the employee" poses an undue hardship. *Id.* Prior to termination, the agency must offer leave without pay "if the employee will seek more extensive rehabilitative therapy that seems promising." *Id. See also McElrath v. Kemp*, 714 F.Supp. 23, 28 (D.D.C.1989) (granting preliminary injunction for employee due to agency's failure to consider allowing employee leave without pay in order to pursue a residential in-patient treatment program). The agency must also counsel the employee as to disability retirement before terminating. *Whitlock*, 598 F.Supp. at 134.

 In order to make out a prima facie case under the Rehabilitation Act, the Plaintiff must establish: (1) that he suffers from a handicapping condition;[8] (2) that he is qualified for the position in spite of his handicap;[9] and (3) that he was terminated from the position solely because of his handicap. *See Matzo v. Postmaster General*, 685 F.Supp. 260, 262 (D.D.C.1987), *aff'd*, 861 F.2d 1290 (D.C.Cir.1988). Once the Plaintiff establishes these elements of a prima facie case, the agency must show that it has reasonably accommodated Plain-

---

**7.** The Ninth Circuit has held that whether the agency reasonably accommodated the handicapped individual is ordinarily a question of fact. *See Fuller v. Frank, supra*, 916 F.2d at 562, citing *Reynolds v. Brock*, 815 F.2d 571, 575 (9th Cir.1987).

**8.** It is undisputed that Plaintiff suffered from alcoholism at the time he was terminated from USIA.

**9.** A "qualified" employee is "a handicapped person who, with or without reasonable accommodation, can perform the essential functions of the position in question without endangering

the health and safety of the individual or others." 29 C.F.R. § 1613.702(f). *See Southeastern Comm. College v. Davis*, 442 U.S. 397, 406, 99 S.Ct. 2361, 2367, 60 L.Ed.2d 980 (1979) (agency is not obligated to ignore the debilitating impact of a given handicap when such handicap would interfere with job performance). Although the parties sharply dispute whether Plaintiff was qualified for the job in spite of his handicap, it is not necessary to reach this issue in light of the Court's findings with respect to the agency's accommodation of the Plaintiff's disease. *See, e.g., Fuller v. Frank, supra*, 916 F.2d at 561, n. 5.

tiff's needs, or alternatively, that further reasonable accommodation would present an undue hardship to the agency.[10] *See Langdon v. U.S. Dept. of Health & Human Services*, 749 F.Supp. 1, 4–5 (D.D.C.1990). The Plaintiff must then rebut the Defendant's evidence of such hardship in order to prevail. *Langdon, supra*, 749 F.Supp. at 5, citing *Prewitt v. U.S. Postal Serv.*, 662 F.2d 292, 303 (5th Cir. Unit A, 1981).

## III. THE AGENCY REASONABLY ACCOMMODATED PLAINTIFF AND PROPERLY DISCHARGED ITS AFFIRMATIVE ACTION RESPONSIBILITIES UNDER THE REHABILITATION ACT.

At bottom, the Plaintiff makes two contentions. First, Plaintiff claims that the agency failed to reasonably accommodate him because the agency issued an "up or out ultimatum" without affording an adequate opportunity to pursue treatment. Second, Plaintiff asserts that the agency failed in its obligation to provide affirmative action programs for alcoholic employees because the agency did not assist Plaintiff in developing a meaningful treatment program. Upon review of governing precedent and the facts of this case, the Court finds that the agency has reasonably accommodated the Plaintiff's handicapping condition. The Court also finds that the agency fulfilled its affirmative action obligations under the Rehabilitation Act.

### A. THE AGENCY REASONABLY ACCOMMODATED PLAINTIFF'S HANDICAPPING CONDITION.

1. *An agency should receive credit for accommodating an alcoholic employee only when the agency takes affirmative action to prod the employee into treatment upon learning of a deficiency in the employee's performance.*

Prior to evaluating whether the agency reasonably accommodated the Plaintiff, the Court first must determine whether the agency's actions prior to October of 1987 (when Mr. Fett imposed disciplinary measures on Plaintiff for dereliction on the job) "count" as accommodation measures under the Rehabilitation Act. The agency claims that employees, including Plaintiff's supervisor, suspected Plaintiff's alcohol abuse in the late 1970s. According to the Defendant, the agency's supportive attitude and willingness to allow Plaintiff to take sick leave is a starting point from which to measure the agency's long history of accommodation. Plaintiff disagrees and contends that the agency's actions should be measured from the time at which Plaintiff's alcoholism interfered with Plaintiff's job performance.

As the Plaintiff points out, the Rehabilitation Act's accommodation provisions become activated only after the agency becomes actually or constructively aware that the employee's alcoholism is contributing to deficiencies in work performance. This construction is amply supported by the caselaw. *See Whitlock, supra*, 598 F.Supp. at 137; *LeMere v. Burnley*, 683 F.Supp. 275, 279 (D.D.C.1988); *Fong v. U.S. Dept. of Treasury*, 705 F.Supp. 41 (D.D.C.1989) (agency not responsible to accommodate handicapping conditions which are concealed by the employee). The implementing regulations also make clear that an agency's duty to reasonably accommodate applies to "handicapping" conditions "known" to the agency. *See* 29 C.F.R. § 1613.702 (handicapping conditions are those which inhibit "major life activities"); 29 C.F.R. § 1613.704(a) (must accommodate "known" handicaps).

Prior to October of 1987, the agency was not confronted with the Plaintiff's alcoholism as a "handicapping" condition. In particular, there were no allegations that alcoholism impaired Plaintiff's work. Moreover, the agency took no affirmative

---

10. In determining whether the accommodation offered to the employee constitutes an "undue hardship" for the agency, the agency should consider: "(1) the overall size of the agency's program with respect to the number of employees, number and type of facilities and size of budget; (2) the type of agency operation, including the composition and structure of the agency's work force; and (3) the nature and cost of the accommodation." 29 C.F.R. § 1613.704(c).

steps during this period to assist the Plaintiff. Plaintiff's efforts at recovery were self-initiated at this time. Acquiescence in Plaintiff's self-initiated treatment in the late 1970s and early 1980s cannot constitute accommodation for purposes of evaluating the agency's decision to terminate the Plaintiff because such "accommodation" was gratuitous and cost-free to the agency.[11]

Defendant contends that preventing the agency from including its "support" for the Plaintiff's treatment efforts in its "accommodation" history would have the perverse effect of limiting the agency's accommodation obligations. As explained, *supra*, at note 10, such a limitation would have no such effect. Instead, the Defendant's proffered reading of the Rehabilitation Act would allow the agency to claim credit for "accommodating" an employee when the agency essentially does nothing more than allow an employee, on his or her own initiative, to visit a counselor and to take sick leave.[12] Accordingly, the Court shall evaluate the agency's accommodation of Plaintiff's alcoholism as of the time the condition became known to the agency as a handicapping condition, *i.e.*, as of October of 1987, when Plaintiff admitted to his supervisor that his alcoholism caused deficiencies in his performance.[13]

2. *The agency afforded Plaintiff an adequate opportunity to obtain treatment for his handicapping condition.*

 Upon evaluating the agency's actions as of October of 1987, the Court is convinced that the agency did reasonably accommodate Plaintiff's handicapping condition. Prior to October of 1987, the Plaintiff availed himself of the agency's counseling services. As recommended in *Whitlock*, the agency issued a "firm choice agreement" when it became apparent that Plaintiff's self-initiated counseling efforts were not preventing alcoholism from negatively impacting his work. This "firm choice agreement" was not punitive. Rather, it prodded Plaintiff to seek treatment for his condition.

Plaintiff argues that the 10–month firm choice plan was not "of sufficient duration to assure [Plaintiff] an opportunity for cure." *Rodgers v. Lehman*, 869 F.2d 253, 259 (4th Cir.1989). This argument lacks force because Plaintiff cannot articulate what type of firm choice plan, based on the evidence available to the agency at the time, would have been more appropriate. Moreover, Plaintiff never addresses the claim that the firm choice program was not renewable at the agency's option. *See* Hoxie dep. at 31.

The record also indicates that the agency acted with due regard for an alcoholic's tendency to relapse. Although Plaintiff had at least one "slip" during the period covered by the firm choice agreement,[14] the agency credited the Plaintiff's overall effort to seek treatment and removed the proposed suspension from Plaintiff's file upon completion of the 10 month period covered by the firm choice pact. The agen-

---

11. This is *not* to suggest, however, that the agency could have prevented Plaintiff from embarking on his own treatment plan. Such obstruction would arguably present an independent cause of action under the Rehabilitation Act.

12. If Plaintiff's sick leave was found to be excessive, and if the supervisor had then recommended counselling to the Plaintiff, then the agency could rightfully claim credit for "accommodating" the employee. *See, e.g., Fuller v. Frank, supra,* 916 F.2d at 560. Such is not the case here. Prior to 1987, Mr. Fett made no counseling recommendation to the Plaintiff and did not complain about excessive sick leave. The Plaintiff initially sought counselling on his own. While USIA and State Department counselors assisted Plaintiff, these counselling services would have been available in any event, and evidence no particular act of accommodation by the USIA.

13. However, as discussed in Section III.A.4., *infra,* the agency may consider the Plaintiff's prior treatment efforts in determining whether Plaintiff has repeatedly failed in treatment. Such an inquiry is relevant in evaluating whether further accommodation would present an undue hardship to the agency.

14. *See* discussion, *supra*, at 573–74 (describing deposition testimony regarding Plaintiff's participation in at least one detoxification program during the firm choice regime).

cy did not merely forgive and forget Plaintiff's problem, however. Upon dissolving the proposed suspension, the agency advised Plaintiff that it would continue to closely monitor his progress. *See* Plaintiff's Exhibit 9.[15]

When the Plaintiff began to exhibit further "slips" in the workplace, agency personnel assisted Plaintiff in obtaining medical attention, driving him to the hospital on at least one, if not two, occasions. Plaintiff's condition continued to deteriorate. After Plaintiff made additional visits to the hospital, Plaintiff entered a 28 day program at Arlington Hospital. The agency then took more severe measures. After consulting with Plaintiff's counselors at Arlington Hospital, agency personnel informed Plaintiff that he would be terminated from the USIA unless he embarked on a path toward sobriety and refrained from showing up at the office under the influence of alcohol. Part of Plaintiff's path toward sobriety included participation in the aftercare program offered by Arlington Hospital. Plaintiff did not complete the Arlington aftercare program and continued in a self-destructive path. The record indicates numerous absences from work and missed doctor's appointments during this June–August 1989 period.

Plaintiff contends that the "last chance" agreement at Arlington Hospital was, in essence, a crude "shape up or ship out" ultimatum. This characterization of the Arlington Hospital "last chance" agreement is unfair. The agency offered the Plaintiff a firm choice between treatment or discipline, based on the recommendations of the medical professionals working on Plaintiff's case. The agency should not be required to second-guess the advice of these professionals. Furthermore, as discussed herein, the agency did not immediately terminate Plaintiff after the Arlington agreement failed.

Despite Plaintiff's relapses after the "last chance" agreement, the agency did not terminate him. Rather, agency personnel met with the Plaintiff and implored him to undertake a sustained, long-term treatment program.[16] The agency asked the Plaintiff to provide a sustained treatment plan for its review.[17] Health care professionals at Montgomery Hospital investigated available options for Plaintiff's treatment, and recommended that Plaintiff pursue such programs. Despite this assistance and encouragement, Plaintiff never provided such a plan until his termination was proposed. After termination was proposed, Plaintiff advised the agency that he had entered an in-patient program at NIH and would enter a supervised apartment program in Virginia. When the agency could not verify Plaintiff's participation in the residential apartment program, the agency terminated the Plaintiff. *See* Exhibit 37, Defendant's Motion for Summary Judgment.

---

**15.** In fact, pursuant to its supervisory powers under the "firm choice" agreement, the agency imposed the "last chance" agreement. *See* Exhibit 18, Defendant's Motion for Summary Judgment.

**16.** Dr. Wilcox apparently discounted these discussions because, in his view, Plaintiff was "already being processed out." *See* Wilcox Dep. at 62–63. Dr. Wilcox's statement does not convince the Court that the agency abandoned Plaintiff at this juncture. Had the agency wanted to terminate Gallagher at the first opportunity, it could have done so after the Plaintiff's unsuccessful enrollment in the Arlington aftercare program. Certainly, the agency could have terminated Plaintiff after the numerous instances of AWOL in July of 1989. Contrary to Dr. Wilcox's and Plaintiff's claims, the record indicates that the agency continued to find ways to give Plaintiff the benefit of the doubt. The

agency would have granted Plaintiff leave to pursue a long-term program, *see* Hoxie Dep. at 53–54, and the agency would have credited the Plaintiff's enrollment in the supervised apartment program had Plaintiff followed through on the recommendations of his counselors. In short, Dr. Wilcox's opinion of the agency's motivations is largely irrelevant; the record indicates that the personnel and supervising officers at the agency would have given Plaintiff the opportunity to achieve a stable recovery, had he taken appropriate steps in that direction.

**17.** According to the Plaintiff, requiring him to fashion a rehabilitation program was ridiculous in light of his obvious inability to function due to severe alcoholism. Plaintiff also contends that such a demand violated the agency's duties to provide affirmative action programs for handicapped employees. The Court addresses these points in Section B of the Opinion, *infra.*

3. *The agency had no obligation to credit Plaintiff's entry into the NIH program, nor was the agency required to wait until Plaintiff completed his latest treatment regime.*

■ The Plaintiff claims that the agency did not provide reasonable accommodation because it did not credit him for entering the NIH program. Although the Plaintiff's decision to enter the NIH program is to be commended, the agency did not fail in its responsibilities under the Rehabilitation Act by terminating Plaintiff in the face of this step toward recovery. The fact that the employee is seeking treatment at the time of termination does not, ipso facto, preclude the agency from following through on its proposal to terminate. *See Fuller v. Frank, supra,* 916 F.2d at 562 (agency not required to credit entry into a treatment program immediately before removal became effective, nor is agency required to await outcome of treatment program before terminating employee); *LeMere v. Burnley, supra,* 683 F.Supp. at 277–278 (agency not required to rescind termination when employee entered treatment two days after making disparaging remarks about viability of treatment programs); *Robinson v. Devine,* 37 FEP Cases 728, 1985 WL 385 (D.D.C.1985).

Moreover, the agency could discount Plaintiff's entry into the NIH program because the program was deemed inadequate by medical professionals. *See Whitlock, supra,* 598 F.Supp. at 134 (prior to terminating, agency "must offer leave without pay if the employee will seek more extensive rehabilitative therapy *that seems promising*") (emphasis added). Specifically, Plaintiff's doctor at NIH advised the agency that Plaintiff had been "refractory to treatment" in the NIH program and that "an extended program" was Plaintiff's best chance for combatting his disease. *See* Exhibit 36, Defendant's Motion for Summary Judgment. Given this prognosis and the fact that Plaintiff had been previously advised to seek long-term treatment such as a protective residential setting, Plain-

tiff's failure to enroll in the supervised apartment program as of October 30, 1989 justifies the agency's decision to follow through with its threatened termination.[18]

4. *The agency properly evaluated whether further accommodation would constitute an undue hardship.*

■ Plaintiff contends that the agency removed him prior to evaluating whether retaining him would present an undue hardship. This claim fails. The record reveals that the agency did evaluate the cost of further accommodation of the Plaintiff's condition. In the letter proposing termination, Ms. Twardowski detailed how further accommodation would hamper the agency's mission:

> Your frequent, unscheduled absen[c]es have placed a tremendous burden on your office and co-workers. In addition to creating additional workload for the staff by not being present to perform your duties, you have served to disrupt the accomplishment of the work of other[s] in your office. Your absences and frequent calling of co-workers at their desks during work hours to discuss your personal problems have been most disruptive and disturbing.

Exhibit 30, Defendant's Motion for Summary Judgment. The record supports the statements made by Ms. Twardowski in this proposal. There were numerous complaints about Plaintiff's disruptive behavior and inability to accomplish his work assignments. *See, e.g.,* Exhibit 16 (a co-worker, Ms. Greenberg, relating numerous instances of Plaintiff's disruptive behavior); Exhibit 17 (Mr. Canning relating Plaintiff's inability to work because he was too drunk); Exhibit 19 (Mr. Fett relating numerous AWOLs); Exhibit 27 (Ms. Becker describing Plaintiff's inability to accomplish his work at the Exhibits Branch).

Concern about the agency's efficiency is a valid basis upon which to find that fur-

---

**18.** Moreover, as the cases indicate, the agency was not obligated to wait until Plaintiff enrolled in the supervised apartment program, especially when there was no guarantee such enrollment would transpire.

ther accommodation would constitute undue hardship. *See, e.g., McElrath, supra,* 714 F.Supp. at 23 ("There must be a balance between an agency's ability to discharge its mission and its duty to consider humane and effective ways of dealing with an employee who is obviously suffering from a disease that is often beyond the employee's own control."); *Walders v. Garrett,* 765 F.Supp. 303, 313–314 (E.D.Va. 1991) (undue hardship to require agency to accommodate employee such that she works only when disease permits); *Bey v. Bolger,* 540 F.Supp. 910, 927 (E.D.Pa.1982) (not required to accommodate to extent office efficiency reduced to an unacceptable level). Given that the Plaintiff's condition had impaired his work since October of 1987, the agency could reasonably find, in September of 1989, that sustaining further ineffectiveness was a sufficient cost to accommodation.

Although dismissal of an employee is appropriate only when an employee "has refused treatment altogether or [has] repeatedly failed in treatment," *Whitlock,* 598 F.Supp. at 131, the agency reasonably concluded that the Plaintiff had repeatedly failed in treatment and that further accommodation would only impede the agency in its mission. Dr. Schmitz informed the agency that Plaintiff was refractory to treatment in the NIH program. Moreover, the agency could consider Plaintiff's numerous self-initiated attempts at rehabilitation prior to October of 1987. While Plaintiff achieved periods of sobriety in these pre–1987 programs, Plaintiff's efforts failed to achieve a sustained sobriety.

In attempting to avoid this outcome, the Plaintiff claims that these prior efforts should not be considered "treatment" for alcoholism. This argument, unfortunately, misses the point: even if long-term treatment was the answer for Plaintiff, Plaintiff had not demonstrated to the agency any desire to embark on this type of program. Thus, the agency was forced to evaluate the prospects for recovery on the basis of the type of treatment which Plaintiff would attend. Viewed in this light, the Court finds the agency's determination to be a reasonable one.

Plaintiff also contends that the agency erred by not considering granting leave without pay to pursue long-term treatment. Agencies should offer leave without pay for the pursuit of treatment that seems promising. *Whitlock,* 598 F.Supp. at 134. Contrary to the Plaintiff's assertions, the Plaintiff did have notice that the agency would support his efforts to obtain long-term care. While there is no direct evidence that the agency told Plaintiff to take an extended leave to pursue such treatment, the agency's prior practices in this case and the Plaintiff's discussions with Ms. Twardowski and Mr. Canning furnished Plaintiff with a sufficient basis upon which to believe that the agency would have supported his efforts to obtain long-term care, including granting appropriate sick leave. Plaintiff failed to enroll in the type of long-term regimen recommended by his doctors. *See* Exhibit 37. The agency cannot be faulted when the employee does not embark on a meaningful program after repeated warnings to do so.

### B. THE AGENCY IS NOT OBLIGATED TO PROVIDE A TREATMENT PLAN FOR ALCOHOLIC EMPLOYEES AS PART OF ITS AFFIRMATIVE ACTION RESPONSIBILITIES.

Plaintiff contends that the agency failed in its responsibility under the Rehabilitation Act because it did not provide Plaintiff with an appropriate treatment program. Plaintiff predicates his argument, in large part, on the notion that the alcoholic employee is unable to ferret out the appropriate treatment program when in the throes of a relapse. Plaintiff also relies on the affirmative action requirement in the Rehabilitation Act. *See* 29 U.S.C. § 791(b). The Court recognizes the incredible pain and many difficulties confronting alcoholics in times of crisis. Although the Rehabilitation Act exhorts federal agencies to become "model" employers of the handicapped and to provide "affirmative action" for such employees, *Whitlock,* 598 F.Supp. at 130, the Court cannot find that the Act makes federal agencies primarily respon-

sible for fashioning an appropriate treatment program for alcoholic employees.

Based upon the implementing regulations, the *Whitlock* court described an agency's affirmative action responsibilities in terms of the reasonable accommodation requirement. *See Whitlock*, 598 F.Supp. at 130. As discussed, *supra*, the Court finds that the agency acted within the guidelines espoused by the Court in *Whitlock*. Placing responsibility for an employee's particular treatment program upon the agency would extend the reasonable accommodation requirement to a point beyond the agency's expertise, and would also absolve the employee of responsibility for his or her future. Neither of these options is desireable, nor justifiable in light of the case precedent.

The *Whitlock* court acknowledged the limitations of agency administrative and supervisory personnel. For example, the Court explained that

> [s]upervisors are instructed not to raise directly the possibility of a drug or alcohol problem.... Rather, it is contemplated that supervisors will make referrals to trained counselors within the agency or on contract to the agency....

*Whitlock*, 598 F.Supp. at 132. Although the Court opined that "[t]his specialization and diffusion of responsibility may impede dealing with alcoholic employees," *id.* at 138, the Court nowhere suggests that supervisory personnel should have primary responsibility for prescribing an appropriate course of treatment for the employee. The agency is responsible for providing appropriate counseling to the employee in the first instance. However, the employee must actively participate in the counselling process and must display a willingness to follow the recommendations of the trained professional(s). *Cf. Whitlock*, 598 F.Supp. at 129 ("All programs require continuous counseling after the initial detoxification, and of course such counseling can only work if the patient is motivated to seek it and continue it, having accepted that he has an alcoholism problem."). Then, the employee, counselor and the agency can together devise a program for the rehabili-

tation of the particular employee consistent with the agency's constraints.

An agency may require the employee to meet with his counselor(s), and to provide the agency with a recommended treatment program for the agency's review. *See, e.g., LeMere v. Burnley*, 683 F.Supp. at 277 (in exchange for three months' leave without pay, employee must first submit an outline of a treatment program recommended by her physician; the program would then be subject to approval of the agency). The agency in this case followed this course of action, making available counselors such as Dr. Wilcox and Terri York. These counselors, in turn, recommended other professionals to the Plaintiff. Although Plaintiff received numerous suggestions from these advisors, he did not implement the long-term proposals which they recommended.

The Court does not expect an alcoholic in crisis to be in a position to plot out his or her own treatment plan alone. Courts recognize that alcoholism often destroys a person's ability to take control. *Cf. McElrath v. Kemp*, 714 F.Supp. at 25 ("a Grade–5 clerk suffering from chronic alcoholism and suddenly without a job[,] was too confused and insufficiently versed in the procedural niceties of the Rehabilitation Act to comply with the administrative requirements"). However, Plaintiff's argument ignores that he had access to counselors throughout his crises, and was not forced to rely on his own devices in putting together a treatment program. Plaintiff's argument also asks the Court to assume that Plaintiff was in one continuous crisis, with no period of clarity sufficient to reflect upon his own well-being. The record belies this underlying premise. Plaintiff did recover from his alcoholism for periods sufficient to obtain treatment plans. In fact, with the help of the NIH program, Plaintiff submitted a proposal to Ms. Twardowski after his termination was proposed. The fact that Plaintiff did not follow through with the proposed treatment is not the fault of the agency.

## IV. CONCLUSION

This case is one of the most heart-rending this Court has encountered in 21 years

on the bench. The Plaintiff is to be commended for his hard-fought efforts to stay sober. While the task of sobriety is not an easy one, the Court is convinced that the Plaintiff has the fortitude to prevail over adversity and the skills to make a great contribution in his chosen field of endeavor. The Court wishes to commend counsel for their professionalism and sensitivity in handling the case. In the opinion of this Court, Mr. Ridley's efforts to assist his client in obtaining treatment and legal representation epitomizes the very best type of advocacy in the legal profession, and should make all lawyers proud.

On the basis of the record herein, the applicable law, and the arguments of counsel, and for the reasons expressed in the foregoing Opinion, the Court finds that the Defendant USIA did reasonably accommodate Plaintiff's handicapping condition and did meet its responsibilities under the Rehabilitation Act of 1973, as amended. Accordingly, the Court shall issue judgment for the Defendant.