James Griffin LANE, Plaintiff,

v.

Federico PENA, et al., Defendants.

Civ. A. No. 94–1608.

United States District Court,
District of Columbia.

Oct. 26, 1994.

Walter A. Smith, Jr., Daniel B. Kohrman, Timothy J. Carlson, and Mitchell E. Zamoff, of Hogan & Hartson, Washington, DC of counsel: Arthur B. Spitzer, of the American Civil Liberties Union of Nat. Capital Area, Washington, DC for plaintiff.

Frank W. Hunger, Asst. Atty. Gen., Eric H. Holder, Jr., U.S. Atty., Brian G. Kennedy and Patricia M. Russotto, of Dept. of Justice Civ. Div. Federal Programs Branch, Washington, DC for defendants.

## MEMORANDUM OPINION

CHARLES R. RICHEY, District Judge.

### INTRODUCTION

Before the Court in the above-captioned case are the parties' cross-Motions for Summary Judgment, as well as their oppositions and replies thereto. This case was originally filed as a preliminary injunction. On July 28, 1994 the Court held a hearing and issued an Order on August 1, 1994 which, with the parties' consent, consolidated a hearing on the Plaintiff's Motion for Preliminary Injunction with a final determination on the merits of the case, pursuant to Rule 65 of the Federal Rules of Civil Procedure. The parties informed the Court that there would be no dispute as to material facts and that the matter could be resolved through cross-motions for summary judgment. On September 29, 1994, the Court held a hearing on the parties' cross-motions for summary judgment.

The Plaintiff filed a preliminary injunction seeking reinstatement to the United States Merchant Marine Academy ("USMMA" or "Academy"). He was admitted to the Academy in July of 1991. Thereafter he developed diabetes but managed to complete his first year. In September of 1992, the Academy informed him that he would be disenrolled due to his medical condition. The Plaintiff argues that the Defendants' actions violate both the Maritime Education and Training Act of 1980, 46 App. U.S.C. § 1295 ("META"), and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 *et seq.* ("Section 504"). In his motion, the Plaintiff seeks a preliminary and permanent injunction requiring the Academy to reinstate Lane immediately, compensatory damages, including out-of-pocket costs, loss of professional opportunity, and pain and suffering, attorneys' fees, and costs.

The Defendants argue, in sum, that the META imposes on USMMA graduates an obligation to serve in an armed forces reserve unit upon graduation as a condition of receiving an education at the Academy. The Defendants contend that the Plaintiff cannot satisfy his reserve service obligation because he has insulin-dependent diabetes mellitus

and, therefore, does not meet the physical standards established by the Department of Defense for a commission in the armed forces reserve. According to the Defendants, the Plaintiff cannot satisfy an essential statutory requirement as a condition of attending the Academy and, therefore, he cannot be considered an "otherwise qualified person with a disability" for purposes of Section 504 of the Rehabilitation Act. The Defendants further argue that the agency's interpretation of the statute warrants due deference by the Court, and assert sovereign immunity with respect to damages.

Alternatively, the Plaintiff argues, in sum, that the META nowhere authorizes the *per se* exclusion of a student simply because he has a medical condition which precludes admission into the naval reserve, when that same condition in no way limits the student's ability to serve in the merchant marine.[1] He further argues that the META mandates only that students qualify for a merchant marine license—not that they also qualify to serve in the naval reserve—and contends that he is eligible for a merchant marine license. Moreover, the Plaintiff maintains that the Court need not afford the agency deference because it has not consistently followed their alleged practice of disenrolling cadets who fail to meet the requirements for a naval reserve commission, and because the plain language of the META demonstrates that no such practice is required. Finally, the Plaintiff asserts that Section 504 was also violated because he was denied the opportunity to complete his education at a federally funded academic institution solely because he developed a disability.

Upon careful consideration of the papers filed by both parties for dispositive relief, the oral arguments of counsel, the applicable law, and the entire record in this case, the Court has determined that the Plaintiff's Motion shall be granted, and the Defendants' Motion shall be denied.

The Court finds that the Defendants violated Section 504 of the Rehabilitation Act by disenrolling Lane solely on the basis of his diabetes and without making any attempt to reasonably accommodate his disability. The Stipulated Facts reveal that James Griffin Lane has repeatedly achieved an "outstanding" rating on the physical readiness exam administered by the Academy, that it is undisputed that James Griffin Lane may qualify for a merchant marine license if he maintains control of his diabetes, that his physician has reported that his diabetes mellitus is under "extremely good control," and that the Academy has allowed students in the past with a lost limb, a lost eye, brain damage, and color blindness to remain at the Academy and graduate despite their disabilities. Nevertheless, the Defendants now refuse to acknowledge that the Rehabilitation Act requires any reasonable accommodation—or even an attempt to provide reasonable accommodation—of Lane's diabetes mellitus. The Court simply cannot accept this untenable reading of the Rehabilitation Act. The Court thus finds that the Defendants have not shown that Lane has failed to meet an essential program requirement under Section 504 or, critically, that the Academy would suffer undue hardship by reasonably accommodating the diabetes mellitus of this otherwise extremely well qualified cadet.

The Defendants argue that the META dictated their disenrollment of Lane. However, the Court further finds that the plain language of the META does no such thing. Neither the statute, the regulations promulgated thereunder, nor the agency's inconsistent practices support the Defendants' position that the Academy was obliged to disenroll Lane upon discovery of his diabetes mellitus. The Court finds that, despite the Defendants' assertions to the contrary, the META contains no requirement that cadets such as Lane meet all physical requirements for a commission in the armed forces reserve or suffer unconditional expulsion from the Academy. Moreover, the Court finds that the agency's reading of the META does not warrant due deference because it is contradicted by the plain language of the statute,

---

1. The Plaintiff does not challenge the Department of Defense's determination that diabetes mellitus prevents an individual from meeting requisite physical qualifications for participation in the armed forces reserve. He only argues that eligibility for the reserve is not a requirement for continued enrollment in the Academy, and that he meets all necessary requirements.

and because the USMMA has acted inconsistently with respect to Lane and other disabled students.

Accordingly, the Court shall order the United States Merchant Marine Academy to reinstate forthwith Plaintiff James Griffin Lane as a student at the USMMA, and shall require the Defendants to take all steps necessary to permit Lane to resume his maritime training as soon as practicable. Finally, the Court finds that the Plaintiff is entitled to compensatory damages for his injuries.

As a result of the Court's findings, judgment must be entered in favor of the Plaintiff. The Court shall issue an Order of even date herewith consistent with this Memorandum Opinion.

### BACKGROUND [2]

In 1990, the Plaintiff, James Griffin Lane, applied for an appointment to the U.S. Merchant Marine Academy, a federal service academy that trains men and women to serve as commercial merchant marine officers and as commissioned officers in the United States armed forces.[3] As a condition of his appointment, the Plaintiff was required to undergo a physical examination to determine if he met the requisite physical qualifications. On November 29, 1990, the Department of Defense Medical Examination Review Board ("DODMERB") administered the examination. Two days earlier, the Plaintiff had submitted a medical history form which asked whether he had at any time "blood, protein, or sugar in urine;" to this, he answered "no." The results of a urinalysis test administered later by DODMERB were "negative" for sugar in the urine.

On June 4, 1991, DODMERB stamped on the Plaintiff's medical evaluation form that he was "medically qualified" and "recommended for service academies and ROTC programs," and the Plaintiff entered the Academy the next month.

On February 1, 1991, Lane consulted a private family physician and reported excessive thirst and hunger. A test showed he had an elevated blood sugar level, and the doctor directed the Plaintiff to limit his intake of calories and take an oral hypoglycemic medication to reduce his blood sugar level. Over a period of seven weeks, Lane's blood sugar level fluctuated between the normal range and higher. In September or October of that year, the Plaintiff had the flu and began to lose weight and again experience excessive thirst and hunger. In December 1991, the Plaintiff was diagnosed with diabetes mellitus by Dr. Didace Kabatsi, a private endocrinologist, who performed several tests on blood and urine samples.

On February 11, 1992, Lane visited Dr. Daniel Kalash, Chief Medical Officer at the Academy, who recorded in his notes that the Plaintiff advised that he had an "intermittent history during [the] past several months of glycosuria [sugar in the urine] and [elevated] blood sugar" and that he had been treated for his condition. He further recorded that the Plaintiff reported he was monitoring his "blood sugar in [his] barracks" and that "all findings [were] normal." Finally, he made the following notes: "Assess: Early Diabetes type I" and "Capt. Bauer notified & communicated problem to BuMed." At that time, Bauer was the Head of the Department of Naval Science at the Academy. Dr. Kalash instructed the Plaintiff to continue observing his blood sugars and report abnormalities and symptoms, and told him that he would repeat the lab workup at the end of the Plaintiff's third class, or sophomore year.

In March 1992, the Plaintiff consulted Dr. Jay Skyler, an endocrinologist at the University of Miami, and President of the American Diabetes Association. Dr. Skyler confirmed that Lane had diabetes, recommended insulin therapy, and referred him to Dr. S. Mark Tanen, an endocrinologist in Northern Virginia. In early July 1992, shortly before commencing his second year, the Plaintiff began seeing Dr. Tanen and, upon Dr. Tanen's recommendation, began insulin therapy.

In a letter dated July 23, 1992, the Plaintiff's father, J.W. Lane, Jr., notified Paul

**2.** Pursuant to the Court's Order of August 1, 1994, the parties filed a Stipulated Statement of Undisputed Material Facts.

**3.** The Maritime Administration ("MARAD"), within the Department of Transportation ("DOT" or "the agency"), administers the USMMA.

Krinsky, the Superintendent of the Academy, that his son had began taking insulin to control his diabetes. On September 4, 1992, the Plaintiff learned that a Physical Examination Review Board ("PERB") hearing had been scheduled for September 8, 1992 to determine his "medical suitability for continuance" at the Academy. The hearing was to confirm that the Plaintiff had insulin-dependent diabetes mellitus, as indicated in his father's July 23, 1992 letter. At the hearing, which Lane attended unaccompanied, the PERB did not evaluate the particular circumstances of Lane's case other than verify his status as a diabetic.

On September 16, 1992, the PERB advised the Superintendent of the Academy that the Plaintiff had insulin-dependent diabetes and that, under U.S. Navy commissioning standards, this was "a disqualifying condition for military service" and, accordingly, that the Plaintiff "would not be commissionable in the Navy/Merchant Marine Reserve Program." The PERB further advised, however, that Lane may not be ineligible for a Coast Guard merchant marine license as the "requirements do not seem to be as rigid as the Navy requirements but a waiver is required when an applicant is insulin-dependent and may not be automatic[;] it would depend on the specifics of the condition."

In contrast to the Department of the Navy, the United States Coast Guard grants merchant marine licenses, including those which permit holders to serve as deck officers at sea, to persons with diabetes mellitus who obtain a waiver of Coast Guard physical qualifications standards with respect to diabetes. Waivers are issued to individuals who show to the Coast Guard's satisfaction that their diabetes is under control and that they are otherwise physically qualified for a merchant marine license. As of December 1993, more than fifty persons with diabetes, some insulin-dependent, are sailing on an active merchant marine license.

On September 21, 1992, the Superintendent advised the Plaintiff that he would be separated from the Academy effective December 18, 1992, and stated that "Adult-onset (Type I) diabetes is a disqualifying condition for military service. You are not

eligible for appointment as Midshipman, MMR/USNR nor for commissioning as a Naval Reserve Officer." The Superintendent advised Lane that he would be permitted to continue to take classes at the Academy through December 18, 1992, and thus complete the first half of his sophomore year. This did not include participation in shipboard training, however.

Lane achieved a 3.4 grade point average during his first year at the Academy, rowed crew, and participated in various sea-going activities, including a four to five day journey up the East Coast in a tugboat, during which storm conditions caused the boat to undergo 40 degree rolls. The Plaintiff's medical records contain no indication that he had any medical problems associated with these activities, and in November 1992, Lane achieved an "outstanding" rating on the physical readiness exam administered by the Academy, as he had achieved each time it was administered previously. In December 1992, Dr. Tanen concluded that Lane's diabetes was under "extremely good control" and noted that he had not experienced any incapacitating episodes due to his condition.

In early October 1992, the Plaintiff's father wrote to Captain Warren G. LeBack, then-Administrator of the U.S. Maritime Administration ("MARAD"), to challenge the Superintendent's decision. In a letter dated January 15, 1993, LeBack responded to the Plaintiff's request for a review of the decision, and between January 15, 1993 and April 15, 1994, the Plaintiff took steps to obtain the assurances specified in the January 15, 1993 letter.

On April 15, 1994, MARAD Administrator A.J. Herberger issued a letter to Lane stating, in part, that Lane could not meet physical qualifications standards applicable to midshipmen at the USMMA because "insulin dependent diabetes disqualifies an individual from receiving a commission in any component of the reserve of the armed forces of the United States."

The Department of the Navy has consistently applied the same physical qualifications standards with respect to diabetes mellitus, which is a disqualifying condition for commissioning in all active duty and reserve

units of the armed forces. In recent years, however, students have attended and graduated from the Academy despite having developed physical disabilities while they were students, which include loss of a limb, loss of an eye, brain damage, and color blindness. Moreover, students with insulin-dependent diabetes have enrolled in and recently graduated from at least one state maritime academy, the Maine Maritime Academy.

### STATUTES AND REGULATIONS APPLICABLE TO THIS CASE

The Plaintiff claims violations of both the Maritime Education and Training Act of 1980, 46 App. U.S.C. § 1295 ("META"), and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 *et seq.* ("Section 504").

#### I. *The META*

In the META, Congress assigned the United States Merchant Marine Academy a two-fold mission: "education and training of citizens of the United States who are capable of providing for the safe and efficient operation of the merchant marine of the United States at all times and as a naval and military auxiliary in time of war and national emergency." 46 U.S.C.App. § 1295(1). Moreover, the statute directs the Secretary of Navy, in cooperation with the Maritime Administrator, to assure that the training of merchant marine officers at the USMMA includes programs for "naval science training in the operation of merchant marine vessels," and that the programs be "consistent with United States Navy standards and needs." *Id.* § 1295(2). The Plaintiff claims that the Academy's primary mission is to serve the merchant marine, and that its secondary goal is to serve as naval and marine reserve. Thus, he contends, Congress did not categorically require that all students at all times meet naval reserve requirements, only that they at all times meet merchant marine requirements. The Defendants argue that both purposes are primary and that, therefore, the Plaintiff's inability to meet requisite physical qualifications for naval reserve status precludes him from continuing at the USMMA.

The Court finds, however, that this statutory language does not clearly lead to either conclusion. It is undisputed that Congress anticipated that the USMMA would serve both the merchant marine and the armed forces reserve. The obligations Congress imposed on cadets at the USMMA with respect to each, however, are covered by other portions of the statute. The Court thus observes that the extent of these obligations is the seminal issue posed by this dispute.

The parties' main contention is over three portions of the statute which explicitly deal with the armed forces reserve. The statute requires that "[a]ny citizen of the United States selected for appointment ... *must agree to apply for midshipman status in the United States Naval Reserve* (including the Merchant Marine Reserve, United States Naval Reserve) before being appointed as a cadet at the Academy." 46 U.S.C.App. § 1295b(b)(3)(F) (emphasis added). The final authority to appoint cadets to a reserve post lies with the Secretary of the Navy:

> Any citizen of the United States who is appointed as a cadet at the Academy *may be appointed by the Secretary of the Navy as a midshipman in the United States Naval Reserve* (including the Merchant Marine Reserve, United States Naval Reserve).

46 U.S.C.App. § 1295b(c) (emphasis added).

The key statutory language at issue in this case, however, deals with a cadet's commitment agreements once he or she is appointed:

> Each individual appointed as a cadet at the Academy ... who is a citizen of the United States, shall as a condition of appointment to the Academy sign an agreement committing such individual—
>
> (A) to complete the course of instruction at the Academy, unless the individual is separated by the Academy;
>
> (B) to fulfill the requirements for a license as an officer in the merchant marine of the United States on or before the date of graduation from the Academy of such individual;
>
> (C) to maintain a license as an officer in the merchant marine of the United

States for at least 6 years following the date of graduation from the Academy of such individual;

(D) *to apply for an appointment as, to accept if tendered an appointment as, and to serve as a commissioned officer in the United States Naval Reserve* (including the Merchant Marine Reserve, United States Naval Reserve), the United States Coast Guard Reserve, or any other Reserve unit of an armed force of the United States, for at least 6 years following the date of graduation from the Academy of such individual; and

(E) to serve in the foreign or domestic commerce and the national defense of the United States for at least 5 years following the date of graduation from the Academy

 (i) as a merchant marine officer;

 (ii) as an employee of the United States maritime industry, if the Secretary determines that service under (i) is not available to such individual;

 (iii) as a commissioned officer on active duty in the armed forces of the United States or in the National Oceanic and Atmospheric Administration; *or*

 (iv) any combination of (i), (ii) or (iii).

46 U.S.C.App. § 1295b(e)(1) (emphasis added).

The Plaintiff argues that this language is conditional, such that cadets only have to apply for and, if tendered, accept a commission in the armed forces reserve. The Defendants contend that this language creates a binding obligation both to serve in the naval reserve or some other armed forces reserve unit and, by implication, to meet physical requirements for such a commission.

Next, the parties focus attention on the power of the Secretary of the Navy to waive any of the statutory service obligations in cases of individual "hardship." The relevant provisions read as follows:

If the Secretary determines that any individual who has attended the Academy for not less than 2 years has failed to fulfill the part of the agreement ... such individual may be ordered by the Secretary of the

Navy to active duty in the United States Navy to serve for a period of time not to exceed 2 years. *In cases of hardship as determined by the Secretary, the Secretary may waive this paragraph.*

46 U.S.C.App. § 1295b(e)(2) (emphasis added).

The statute continues with a similar provision:

If the Secretary determines that any individual has failed to fulfill any part of the agreement ... such individual may be ordered to active duty to serve a period of time not less than 3 years.... *In cases of hardship as determined by the Secretary, the Secretary may waive this paragraph.*

*Id.* § 1295b(e)(3)(A) (emphasis added).

While the Plaintiff argues that this language proves that Congress did not intend the *per se* rule that cadets qualify for the naval reserve at all times, the Defendants assert that this language only affords waiver for hardship incurred by cadets during their third or fourth years at the Academy.

Further, the parties disagree over how to interpret properly the provision of the statute addressing the awarding of Bachelor of Science degrees to cadets:

The Superintendent of the Academy may confer the degree of bachelor of science upon any individual who has met the conditions prescribed by the Secretary and who, if a citizen of the United States, has passed the examination for a merchant marine officer's license. *No individual may be denied a degree ... because the individual is not permitted to take such examination solely because of physical disqualification.*

*Id.* § 1295b(g) (emphasis added). The Plaintiff argues that the Defendants violated the META under this provision by disenrolling him due solely to his medical condition, while the Defendants assert that this provision speaks only to qualifying for merchant marine licenses, not to meeting armed forces reserve requirements.

Finally, the parties discuss the agency regulations promulgated under the META. The Academy is administered by the Maritime Administration ("MARAD"), which is within

the Department of Transportation ("DOT"). The general regulatory provisions promulgated under the META with respect to the USMMA read as follows:

*Midshipmen are appointed to the Academy for training to prepare them to become officers in the U.S. merchant marine.* The Academy, located at Kings Point, New York, is maintained by the Government as a part of the Administration. After successful completion of the 4–year course of study, a graduate of the Academy shall receive a Bachelor of Science degree and a merchant marine license as either a third officer or third assistant engineer ... issued by the U.S. Coast Guard. *If qualified, an officer may be commissioned as an officer in a reserve component of an armed force of the United States.*

46 C.F.R. § 310.52(a) (emphasis added).

The regulations also reiterate the statutory requirement that USMMA cadets *"[a]pply for an appointment as, accept any tendered appointment as* and serve as a commissioned officer in the USNR (including the Merchant Marine Reserve, USNR), the United States Coast Guard Reserve, *or* any other Reserve component of an armed force of the United States...." 46 C.F.R. § 310.58(a)(4) (emphasis added).

The relevant regulations regarding physical standards for admission and training of midshipmen at the USMMA read as follows:

*Physical standards.* (1) *A candidate shall meet the physical requirements prescribed by the Department of the Navy for appointment as Midshipman, USNR [United States Naval Reserve] (including the Merchant Marine Reserve, USNR) and the requirements prescribed by the U.S. Coast Guard for original licensing as a third mate and third assistant engineer.* All candidates shall have color perception and refractive error within the limits prescribed by the Department of the Navy or by the U.S. Coast Guard, whichever are higher.

46 C.F.R. § 310.56(a) (emphasis added).

In addition, the regulations provide for waiver of some medical requirements for en-

rolled students and applicants to the USMMA:

(2) The requirement to meet these standards is a continuing one and shall apply through graduation from the Academy. Failure to meet the standards while attending the Academy is grounds for, and may lead to disenrollment. *Individuals who have completed at least two years of study and, as a result of an accident, illness or other cause (during official duty), fail to meet this requirement may be permitted to remain at the Academy at the discretion of, and under conditions set by, the Administrator....*

46 C.F.R. § 310.56(a) (emphasis added).

Later, the regulations state:

The Administrator *shall have the discretion to grant waivers* of the service obligation contract in cases where there would be undue hardship or impossibility of performance due to accident, illness, or other justifiable reason.

46 C.F.R. § 310.58(f).

The Plaintiff argues that, like the META, the regulations employ conditional language which, along with the allowance for waiver upon hardship, support the conclusion that the agency does not follow a hard and fast rule that all Academy students meet requirements for a naval reserve commission at all times. The Defendants, however, point to another regulatory provision in order to demonstrate that the agency policy is clear:

Since commissioning in the United States Navy, or any other branch of the Armed Forces, is a requirement for graduation, *no waivers will be granted for medical conditions which would prevent commissioning in at least a restricted status in the U.S. Navy Reserve.*

*Id.* § 310.56(d) (emphasis added).

As discussed in detail below, the Court finds that the META does not contain a clear statutory requirement that every cadet both serve in, and at all times meet physical qualifications for, commissioning in the armed forces reserve. This conclusion is critical to the Court's analysis under Section 504.[4] The

4. The Defendants claim that a suit for violation of the META cannot be maintained because the

Court further finds that the agency's regulatory interpretation of the META in 46 C.F.R. § 310.56(d) does not support the Defendants' contention that the META obliged them to separate Lane from the USMMA for failure to meet physical requirements for commissioning in the naval reserve.

## II. SECTION 504 OF THE REHABILITATION ACT

The Plaintiff claims that, even if the Defendants could show that Congress required all Academy students to meet physical criteria for commissioning in the naval reserve, it would not necessarily follow that such a requirement is "essential" within the meaning of Section 504, which states:

> No otherwise qualified handicapped individual with a disability in the United States ... shall, solely by reason of his or her disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency....

29 U.S.C. § 794(a) (Supp.1994) (emphasis added).

The relevant DOT regulation reads as follows:

> Qualified individual with handicaps means—(1) With respect to education services provided by the U.S. Merchant Marine Academy or the U.S. Coast Guard Academy, an individual with handicaps who meets the essential eligibility requirements for participation in and receipt of such services, including the physical standards applicable to the U.S. Naval Reserve or the U.S. Coast Guard.

49 C.F.R. § 28.103.

The Plaintiff argues that, here, Lane is clearly qualified to continue at the Academy. The Defendants argue that, since commissioning in a reserve unit of the armed forces

is, under their reading of the META, a statutory requirement for receiving an education at the USMMA, physical qualification for such a commission is necessarily an "essential" condition which must be satisfied. The Court agrees with the Plaintiff that the Defendants have violated Section 504 by disenrolling him solely on the basis of his diabetes mellitus, without attempting to provide reasonable accommodation, and without making an individualized determination under Section 504.

The Court shall now turn to its analysis of the Defendants' actions with respect to Plaintiff Lane under both statutes.

## DISCUSSION

## I. THE PLAIN LANGUAGE OF THE META DOES NOT REQUIRE ALL CADETS TO BE ELIGIBLE FOR RESERVE SERVICE AT ALL TIMES

The crux of the Defendants' argument under both statutes rests on the agency's reading of the META as expressly mandating that all USMMA students meet the physical requirements for commissioning in the armed forces reserve. The Court finds that the Defendants have unreasonably stretched the plain language of the META too far.

It is undisputed that, on its face, the META sets forth a requirement that USMMA students apply for and, if tendered, accept an appointment as a commissioned officer in the naval reserve, or another reserve unit of the armed forces. 46 U.S.C. § 1295b(e)(1). From this language, the Defendants conclude not only that the META contains an express requirement that all USMMA students serve in the armed forces reserve, but that it further contains a clear requirement that all students at all times meet physical eligibility requirements for commissioning in the reserve. The Defendants concede in their papers that the physical eligibility requirement is, at best, implied

META does not create a private cause of action. Defendants' Motion, at 17 n. 6. Without further briefing the issue, however, the Defendants further state that they "treat the essential elements of plaintiff's cause of action under [the META] as though they stated a claim for violation of the

Rehabilitation Act." *Id.* Accordingly, for purposes of this Memorandum Opinion, the Court shall address the Plaintiff's claim without reaching the separate issue of whether a private cause of action exists under the META.

from the statute. Defendants' Motion, at 20. Thus there is no clear mandate from Congress that Lane or any other cadet meet physical standards for the naval reserve. Accordingly, the Court finds that the Defendants' further arguments under the META *and* Section 504 lack merit because they are based on the erroneous premise that the META contains a clear and unconditional requirement that all enrolled students meet armed forces reserve requirements.

**A. The META only mandates that USMMA students qualify for a license as an officer in the merchant marine and apply for and, if tendered, accept a commission in the armed forces reserve.**

■ The Defendants maintain that the "apply for" and "accept if tendered" language of the META requires that cadets obtain a commission in an armed forces reserve unit as a condition of receiving a taxpayer-funded education at the USMMA. 46 U.S.C. App. § 1295b(e)(1). By necessary *implication,* the Defendants argue, the statute also contains a requirement that cadets meet the physical standards to satisfy that obligation.

The Court finds, however, that the language of the META speaks for itself. The plain language of the META requires each cadet to apply for an appointment in the reserve and, if an appointment is offered, to accept it. Indeed, it is undisputed that cadets must apply for such a position. However, the only logical way to give effect to the "if tendered" language is to conclude that, *upon application* for a reserve commission, receipt of such commission becomes conditioned on an evaluation of the cadet's eligibility for a reserve unit at that time. Consequently, in section 1295b(b)(3)(F), Congress required that individuals selected for appointment at the Academy "must *agree to apply for* midshipman status in the United States Naval Reserve ... before being appointed as a cadet at the Academy." *Id.* (emphasis added). The statute further states that individuals appointed as cadets at the Academy "*may be appointed* ... as a midshipman in the United States Naval Reserve...." 46 U.S.C.App. § 1295b(c) (em-

phasis added). Thus, consistently, Congress employed unconditional language only to express the requirements that cadets apply for the reserve, and conditional language to express the possibility that cadets "may be appointed" as midshipmen in the reserve upon graduation. The Court finds no support for the Defendants' suggestion that Congress did not require what the plain language expresses, namely, that all cadets apply for and accept if tendered a commission in the armed forces reserve but, rather, that Congress required that all cadets serve in, and at all times qualify for, the reserve.

Moreover, in the same subsection containing the "apply for" and "accept if tendered" language, namely, 46 U.S.C.App. § 1295b(e)(1), Congress affords cadets a *choice* in meeting their duty "to serve in the foreign or domestic commerce and the national defense" upon graduation. *Id.* § 1295b(e)(1)(E). Congress expressly provided that, as part of their commitment agreement, students must serve as *either* merchant marine officers, employees in the maritime industry, *or* commissioned officers. *Id.* The Defendants argue that the statutory active duty requirement is entirely separate from the alleged reserve service requirement, and remind the Court that statutes must be read to give meaning to every section.

This, however, is precisely what the Court intends to do. Again, the Court finds that nowhere does the META require, as the Defendants assume, that each and every cadet serve in the armed forces reserve. It only requires that students apply for a reserve commission and accept one if tendered. With respect to the META's *express active* duty requirement, however, the META gives cadets a choice. As long as each cadet serves in one of the three capacities listed in the statute, they have fulfilled their postgraduation commitment under the META. The Court finds that, given the express statutory allowance of a choice upon graduation regarding active duty, it cannot conclude that, on the other hand, Congress *impliedly* intended an unconditional requirement that all cadets serve in a reserve unit of the armed forces. Accordingly, the Court also finds that there is no merit to the Defen-

dants' contention that the statute impliedly requires that all cadets be qualified for armed forces reserve positions throughout their training.

Furthermore, the Court observes that other subsections of the META *are un*conditional; thus Congress knew how to make an express, mandatory requirement when it wanted to. For example, in the same section which sets forth the "apply for" and "accept if tendered" language, the statute unconditionally requires cadets to complete the Academy's course of instruction, to fulfill the requirements for a license as an officer in the merchant marine of the United States,[5] to maintain a license as an officer in the merchant marine of the United States for at least 6 years following graduation, and to serve as either a merchant marine officer, an employee in the maritime industry or as a commissioned officer in the armed forces upon graduation. 46 U.S.C.App. § 1295b(e)(1)(A)–(E).

The Court observes that, if Congress so clearly intended to make service in, and qualification for, the reserve an unconditional requirement, it would have used the unconditional language it employed throughout the rest of section 1295b(e)(1) in order to say just that. Moreover, because the statute contains a provision regarding fulfillment of the requirements for a merchant marine license, the absence of such a provision regarding the requirements for a reserve commission suggests that Congress did not intend that satisfaction of standards for service in the reserve be an absolute graduation requirement. *See I.N.S. v. Cardoza–Fonseca,* 480 U.S. 421, 432, 107 S.Ct. 1207, 1213, 94 L.Ed.2d 434 (1987) ("[w]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclu-

sion or exclusion") (quoting *Russello v. United States,* 464 U.S. 16, 23, 104 S.Ct. 296, 300, 78 L.Ed.2d 17 (1983)).

The Defendants explain the tentative nature of the language in the META as reflecting the President's appointment power—because the President, acting through the Secretary of the Navy, is empowered under the Constitution to determine who will be offered a reserve commission, Congress cannot mandate appointment. However, Congress has used much stronger language than that of the META to mandate that graduates of Annapolis and West Point accept positions in the reserve if an active duty commission is not tendered. *See* 10 U.S.C. § 6959(a)(3) (App.1994) (graduates *"will accept* an appointment as a commissioned officer in the Naval Reserve") (emphasis added); 10 U.S.C. § 4348(a)(3) (App.1994) (graduates *"will accept* an appointment as a commissioned officer as a reserve for service in the Army Reserve or Air Force Reserve") (emphasis added). Moreover, even accepting arguendo Defendants' argument that the tentative nature of the META's language reflects the reservation of the appointment power to the President, Congress still could have required every student to meet the requisite qualifications for a naval reserve commission in the event that the President does appoint certain students to the reserve. Instead, Congress required only that cadets fulfill the requirements for obtaining a merchant marine license.

The Defendants themselves point to the military academy statutes cited above, which contain the "accept" and "if tendered" language in describing the active duty requirements, to support their argument that all cadets must serve in the armed forces reserve and therefore must meet physical prerequisites for the reserve while at the USM-

---

5. The Defendants argue that the Plaintiff necessarily implies physical requirements into the subparagraph of the META which sets forth this prerequisite to appointment to the USMMA and that, therefore, the same implication must be afforded the "apply for" and "accept if tendered" language of the subparagraph addressing reserve commissions. *See* 46 U.S.C.App. § 1295b(e)(1)(B)(D). The Court observes, however, that subparagraph B states that students must "fulfill the requirements" for obtaining a merchant marine license. *Id.* § 1295b(e)(1)(B). It is not such an intuitive leap to imply "physical

or otherwise" into language which expressly deals with requirements for obtaining a merchant marine license. In contrast, subparagraph D says nothing about requirements or prerequisites for obtaining a commission in the armed forces reserve. Thus, the Court cannot agree with the Defendants that, in light of the Plaintiff's reading of physical requirements into subparagraph B, it is a necessary implication of subparagraph D that a student must satisfy the physical requirements for commissioning in the armed forces reserve.

MA. *See* 10 U.S.C. § 6959(a) (Annapolis); 10 U.S.C. §§ 4348(a)(3) (West Point). The Defendants assert that the language of the META mirrors the language employed by Congress in these statutes "which has been recognized as creating the service obligations of graduates" of Annapolis and West Point. Defendants' Opposition, at 10–11. The Defendants further warn that, if the Court invalidates the reserve service requirement at the USMMA, it must also invalidate the same requirement at the Naval, Military, Air Force and Coast Guard Academies because each uses the same statutory language to create the same obligations.

The Court finds these arguments without merit. First, it is undisputed that the Annapolis Academy and West Point serve only a military purpose. In contrast, Congress charged the USMMA with a dual purpose and, accordingly, gave cadets a choice of where to serve their active duty after graduation. 46 U.S.C.App. § 1295b(e)(1)(E). Thus there is no support for the sweeping conclusion that the Court's holding with respect the USMMA will have grave implications for service academies whose sole purpose is to provide the military with trained officers. Indeed, the unique nature of the "dual purpose" of the USMMA is what, at bottom, generated this dispute.

In addition, the language of 10 U.S.C. § 6959(a) and § 4348(a), when read in context, does *not* mirror that of the META. Rather, both Title 10 statutes contain unconditional language requiring that cadets *"will accept* an appointment as a commissioned officer" in the reserve *if* an appointment in the *regular* Army, Air Force or Marines is not tendered. 10 U.S.C. §§ 6959(a), 4346(a) (App.1994) (emphasis added). Thus in these statutes, Congress used unconditional language to create the reserve requirement, and conditional language to create the active duty requirement. Similarly, the META contains an unconditional requirement to obtain and maintain merchant marine license, and a conditional requirement to serve in the armed forces reserve. 46 U.S.C.App. § 1295b(e)(1)(B)–(D). Moreover, unlike in the META, in neither military academy statute did Congress include the lesser preliminary requirement that cadets *apply for* a commission in either the regular armed forces or the reserve. Clearly, Congress envisioned something different, to at least some degree, for students appointed to the USMMA than it did for students at Annapolis or West Point.[6] The Court finds that it must give effect to congressional intent as expressed by the plain language of the META.[7]

**B. The META's language affording waivers for hardship and precluding the denial of degrees based solely on an inability to meet the physical requirements for obtaining a merchant marine license undermines the Defendants' central argument.**

In support of the argument that Congress created a mandatory requirement that

---

6. Moreover, the Court observes that the case cited by the Defendants for the proposition that a graduate of West Point incurs a duty service obligation is not controlling of the Court's reading of the "apply for" and "accept if tendered" language under the META. In *Shaffer v. Cheney,* 725 F.Supp. 40 (D.D.C.1989), the district court cited 10 U.S.C. § 4348(a)(2)(B) for the proposition that "[a] graduate of [West Point] *generally* incurs a five-year [active duty service obligation]." *Shaffer,* 725 F.Supp. at 46 (emphasis added). The court made no express holding with respect to the "if tendered" and "accept" language of the statute which nevertheless, as described above, differs from that of the META. Accordingly, the Court finds that *Shaffer* in no way supports the Defendants' claim that the language of the META, a wholly different statute from those discussed in *Shaffer,* firmly establishes a service obligation. *Shaffer,* 725 F.Supp. at 46.

7. The Defendants submit a detailed description of the META's legislative history and conclude that Congress's "clear expectation" was that USMMA graduates would serve in both active and reserve duty upon graduation. Defendants' Motion, at 25–31, 30. The Court observes, however, that the legislative history, as cited by the Defendants, does not unambiguously support this conclusion. Rather, portions of the testimony quoted by the Defendants also support a conclusion that Congress envisioned that eligibility for a reserve commission would be determined upon application for such a commission. *See id.* at 28. Moreover, nothing cited by the Defendants speaks to their reading of the META as impliedly mandating that all students such as Lane meet physical requirements for a reserve commission or suffer disenrollment. Accordingly, the Court declines to afford considerable weight to the legislative history cited by either the Defendants or the Plaintiff.

all cadets meet the physical qualifications for a commission in the armed forces reserve, the Defendants claim that the statutory language affording waiver in cases of hardship creates a quid pro quo between a cadet and the Government—if the cadet fails to fulfill his or her agreement, the Secretary of the Navy can order him or her to active duty in the armed services as a "pay back" for receiving a taxpayer-funded education at the USMMA. *See* 46 U.S.C.App. § 1295b(e)(2)–(3)(A). The Defendants further contend that this deal assumes that each cadet would be qualified to serve in a reserve unit of the armed forces.

The Plaintiff argues, however, that the language waiving this duty for "hardship" confirms that Congress did not intend that it be mandatory for all cadets to meet physical qualifications for a naval reserve commission at all times. The Court agrees with the Plaintiff that the language affording waiver for hardship undermines the argument that USMMA students at all times must meet physical requirements for a commission in the naval reserve. Indeed, the Defendants cannot, and do not, deny that a waiver exists, but argue that the agency's interpretation of the statute as strictly limiting the waiver to students in their third or fourth years at the Academy, is a reasonable one.

The Court notes at the outset that, in arguing that the hardship waiver only applies to third or fourth year students, the Defendants concede that the reserve requirements, if any, do not apply at all to students in their first and second years. In particular, the Defendants state that "a midshipmen's obligations under the statute do not even become effective until a student has completed 2 years of study.... Thus, prior to their junior year, there is nothing for the Secretary to waive." Defendants' Opposition, at 18–19. The Defendants argue that the Academy can disenroll first and second year students who fail to meet the requirements for a reserve commission because "the government can see immediately that it will not get the benefit of its bargain with that midshipman." *Id.* at 19.

However, the Court observes that, if the Defendants concede that the reserve obligations do not apply to students such as Lane, their argument that Lane was separated from the Academy because of his failure to meet statutory reserve requirements loses any merit. The Court is puzzled and unpersuaded by the Defendants inconsistent statements. The Defendants want to argue on one hand that, because the statute contains a clear requirement that cadets meet prerequisites for a reserve commission, Lane's disenrollment was warranted. Yet on the other hand, the Defendants want to argue that the agency's refusal to extend the statute's waiver provisions to first and second year students is warranted because the clear requirement regarding reserve duty does not apply to such students. The Defendants cannot have it both ways. Moreover, the Court finds that the Defendants' alternative argument that Lane's disenrollment was permissible because "the government is justified in terminating the arrangement before any obligation is incurred" in order to get its "benefit of the bargain" is wholly unsupported by the statute or the regulations. *Id.* at 19.

Moreover, notwithstanding the hardship provisions, the Court finds the language of 46 U.S.C.App. § 1295b(g) difficult to square with the Defendants' main contention. That provision expressly states that "[n]o individual may be denied a degree ... because the individual is not permitted to take [the merchant marine officer's license] examination solely because of physical disqualification." 46 U.S.C.App. § 1295b(g). The Defendants argue that this language allows cadets to graduate despite physical disabilities disqualifying them from receiving a merchant marine officer's license. Read in conjunction with § 1295b(e)(1)(B), which requires that cadets obtain their license as a precondition to receiving a USMMA degree, the Defendants assert that section 1295b(g) alleviates the "harsh result" which would follow from statutorily precluding cadets from receiving a degree where they develop a physical disability which disqualifies them from obtaining a merchant marine license. Defendants' Opposition, at 13–14. The Defendants contend that this provision operates to remove the statutory pre-condition to graduation where cadets develop a physical problem late in their studies, but in no way relieves gradu-

ates of their separate active duty and reserve service obligations, as the Plaintiff maintains.

The Court finds the Defendants' argument unconvincing. The Court agrees that this provision in no way directly speaks to the alleged requirement that all cadets meet physical qualifications for commissioning in the armed forces reserve. However, the fact that Congress afforded an express waiver of a express condition for admission to the USMMA is quite telling. It is undisputed that Congress intended all cadets to fulfill the requirements for, and to maintain a license as, an officer in the merchant marines. 46 U.S.C.App. § 1295b(e)(1)(B)–(C). From these clear mandates, a requirement that cadets meet the requisite physical qualifications for such a license can be easily implied. If not, these express requirements would be meaningless. The Defendants apply the same reasoning to imply a requirement that cadets meet armed forces reserve qualifications from section 1295b(e)(1)(D), which contains the "apply for" and "accept if tendered" language. That language, however, does not set forth the same clear mandate contained in the provisions listed directly before it.

Moreover, it is undisputed that the requirements for a merchant marine license are not as rigorous as those for a reserve commission. See Stipulated Facts at ¶ 36. Indeed, the Defendants conceded at the hearing that Lane could obtain such a license if his diabetes were kept under control. In addition, the Court notes that at least 50 people with the same condition are currently operating under a merchant marine license at sea. Id. at ¶ 39.

It then follows that, because the physical qualifications for a merchant marine officer's license are less stringent than those required for a naval reserve commission, and because the statute explicitly states that a cadet cannot be denied a diploma because he or she could not meet the qualifications for a merchant marine officer's license, it would be illogical to conclude that the same person with the same disability would be subject to disenrollment for failure to meet the more stringent—but implied—naval reserve prerequisites. The Defendants argue that section 1295b(g) is irrelevant because it applies only to merchant marine license requirements, not to qualifications for commissioning in the reserve. This argument, however, does nothing to explain why Congress would intend such inconsistent results with respect to physical disqualification for express, versus implied, sets of requirements.

The Defendants claim that, while section 1295b(g) applies to merchant marine license requirements, the statutory provisions for waiver upon hardship apply to the alleged naval reserve requirement. Under section 1295b(e)(3)(A), a cadet who fails to meet his or her maritime or military reserve service obligations must perform active duty military service for a period of three to five years, depending on the unexpired portion of their obligation. If the Secretary of Defense is unable or unwilling to order the defaulting graduate to active duty service, the Secretary of Transportation may recover the cost of educating that individual. Id. § 1295b(e)(3)(B). The Defendants further observe that Congress authorized the Secretary of Transportation to waive the provision allowing defaulting graduates to be called to active duty service in cases of hardship. Id. § 1295b(e)(3)(A). The Defendants thus conclude that this provision, not section 1295b(g), provides authority for the agency to excuse a defaulting graduate's reserve service obligations.

However, these latter provisions deal with punishment for failing to comply with the express requirements for appointment to the Academy. If a cadet fails to meet these requirements, such punishment is automatically imposed under the statute. At that point, the Secretary may waive the punishment upon a finding of hardship. This is a very different scheme from that of section 1295b(g) which completely waives an express requirement to graduation, with no repercussions. Again, how Congress would on one hand expressly avoid the "harsh result" of precluding cadets from graduating from the United States Merchant Marine Academy for their failure to meet physical requirements for a merchant marine license, yet on the other impliedly mandate that these same cadets meet more stringent standards for a reserve commission or lose their appointment

at the Academy, is a mystery which the Defendants have not explained. To use the Defendants' characterization of the purpose behind section 1295b(g), the latter result, which the Defendants condone, is a *particularly* "harsh" one which Congress surely would not have intended if, as the Defendants concede, it intended to prevent the harsh result of precluding cadets from graduating for failure to meet physical prerequisites to obtaining a merchant marine license.

Moreover, this result contradicts the Defendants' argument that Congress intended the USMMA to serve two priorities equally, namely, to serve the merchant marine and to serve the armed forces reserve. Rather, under the Defendants' construction of the statute, Congress must have intended that more leniency be employed with respect to merchant marine license requirements than with respect to armed forces reserve requirements. Surely, this could not have been Congress's intention for the United States Merchant Marine Academy. The Court thus concludes that the META does not contain a requirement that all cadets, absent a waiver for hardship late in their education, must at all times meet physical prerequisites for commissioning in the armed forces reserves if they are to remain at the Academy.

Finally, the Defendants argue that the Plaintiff's interpretation of section 1295b(g) effectively nullifies any physical requirements for graduation because it presumes that Congress simultaneously established service in the merchant marine as a condition of attending the USMMA *and* precluded the Academy from enforcing that requirement through physical prerequisites to admission. However, the Defendants ignore the distinction between admission and graduation after enrollment. This provision clearly applies to *enrolled* cadets, and the Plaintiff's argument speaks to enrolled cadets. Nowhere do the Defendants point to any authority indicating that section 1295b(g) also applies to individuals *seeking* enrollment. Both section 1295b(g) and the waiver provisions envision situations where cadets begin their education at the USMMA and, for some reason, face an obstacle to meeting every provision in the META, whether the obstacle is self-imposed or not. Accordingly, the Court sees no reason why it cannot adopt the Plaintiff's view and remain in consonance with the express requirements the META sets forth for appointment to the Academy.

**C. MARAD's own regulations, and its inconsistent interpretation thereof, belie the Defendants' argument that the USMMA has an unconditional rule that all cadets meet all physical requirements for commissioning in the armed forces reserve, absent waiver late in their education.**

As discussed above, the Court finds that the agency's decision to separate Lane from the Academy upon discovery of his diabetes mellitus conflicts with the plain language of the statute. Moreover, the Court observes that the agency's own past practices and regulations undermine the Defendants' claim that MARAD was bound to disenroll Lane when it learned of his diabetes.

First, the Court observes that in cases involving disabilities other than diabetes, disabled students have been allowed to remain at the Academy and receive their academic degree. Stipulated Facts at ¶ 37. The Defendants do not contest that the Academy allowed students to remain at school and graduate despite the Academy's learning, during the term of their enrollment, that the students were color blind. *Id.* Notably, unlike diabetes mellitus, color blindness is a disability which, as the Court is advised, disqualifies an individual from obtaining not only a naval reserve commission, but a merchant marine license as well. Plaintiff's Motion for Preliminary Injunction, Exhibit 15 at ¶ 6 (Declaration of Commander Joseph Gebhard). *See also* 46 C.F.R. § 10.205(d). In addition, in recent years, students have attended and graduated from the Academy despite the loss of a limb, loss of an eye, and brain damage, while they were students. Stipulated Facts at ¶ 37.

Moreover, the Academy's actions with respect to Lane were inconsistent with its alleged *per se* policy. The Stipulated Facts reveal that, in addition to allowing other disabled students to graduate despite this rule, Dr. Kalash, the Academy's Chief Medical

Officer assessed Lane back in February of 1992 as having "Early Diabetes Type I," yet took no action. In addition, Dr. Kalash noted that "Capt. Bauer notified & communicated problem to BuMed," the Head of the Department of Naval Science at the Academy, and instructed Lane to monitor his blood sugar levels and report any abnormalities. Stipulated Facts at ¶¶ 13–14. Moreover, upon receipt of a letter from Lane's father requesting review of the agency's decision, Captain LeBack, then-Administrator of MARAD, did not invoke the unconditional rule that enrolled cadets who discover conditions which disqualify them for naval reserve service must be disenrolled, but put Lane on "administratively approved absence status" and afforded him "the opportunity to establish as fact the arguments raised on [his] behalf." Plaintiff's Motion for Preliminary Injunction, Exhibit 11 at 3 (letter from LeBack to Lane dated January 15, 1993). Thus, rather than acting immediately to disenroll Lane in accordance with its alleged "long standing" policy,[8] the Academy permitted Lane to remain at the school for close to a year before finally separating him from the Academy, and for seven months before initiating proceedings to do so. *See* Stipulated Facts at ¶¶ 11–19, 21–22, 27.

Moreover, the agency's own regulations contradict the Defendants' claim that this "long standing" policy is clear and has been consistently implemented. The Plaintiff argues that the government claims discretionary authority under its own regulations to permit candidates to remain at the Academy despite failure to meet naval reserve requirements. Thus, he claims, there is no *per se* exclusion of all students not meeting these requirements. The Defendants claim that, because of his diabetes, the Plaintiff cannot meet the physical requirements set forth in the regulations, which mandate Lane's disenrollment ·but fulfill congressional intent by allowing for waiver upon hardship incurred by cadets late in their education.

The Court first observes that the regulations do, in part, require candidates for admission to "meet the physical requirements . . . for appointment as Midshipman, [United States Naval Reserve,]" as well as those for obtaining a merchant marine license. 46 C.F.R. § 310.56(a). Moreover, the regulations state that failure to meet these standards "while attending the Academy is grounds for, and may lead to disenrollment." *Id.* § 310.56(a).

However, the Court finds the regulations internally inconsistent. For example, the regulations state that "[i]ndividuals who have completed at least two years of study and, as a result of an accident, illness or other cause (during official duty), fail to meet this requirement may be permitted to remain at the Academy at the discretion of, and under conditions set by, the Administrator . . . ." *Id.* Later, however, the regulations allow for waiver for hardship without imposing *any* limitation on first and second year students. *Id.* § 310.58(f).

Moreover, the Court finds that these regulations, read together with others, simply do not support the Defendants' claim that a *per se* rule exists which required Lane's disenrollment after his first year. First, the regulations properly employ the conditional language of the statute, and definitively state that cadets "are appointed at the Academy for training to prepare them to become officers in the U.S. merchant marine" and that after graduation they shall receive a merchant marine license. *Id.* § 310.52(a). Later, the regulations state that "*[i]f qualified,* an officer *may be* commissioned as an officer in a reserve component of an armed force of the United States." *Id.* (emphasis added).

Thus the mission of the USMMA, here reflected as its primary one, to train students to become merchant marine officers is made clear, the need for students to qualify for merchant marine licenses is made clear, and the fact that cadets may—not must—be commissioned in the armed forces reserve, if qualified, is made clear. Notably, the regulations recognize that only "qualified" students may be commissioned as officers in the armed forces reserve, and thus assume that all enrolled students will not qualify. 46 C.F.R. § 310.52. The Court observes that such a reading is consistent with the lan-

8. Defendants' Opposition, at 16.

guage of the META and does not justify the Defendants' peremptory expulsion of Lane for failure to qualify while a student at the USMMA.

Second, the regulations require that cadets "[a]pply for an appointment as, [and] accept any tendered appointment as" a commissioned officer in the United States Naval Reserve, the United States Coast Guard Reserve *or* any other Reserve component of the armed forces. *Id.* § 310.58(a)(4) (emphasis added). Thus, under the agency's express regulations, Lane can fulfill his statutory obligations by serving in the Coast Guard Reserve. The Defendants have conceded that Coast Guard service is possible if Lane keeps his condition under control, and they have conceded that Dr. Tanen, an endocrinologist treating Lane, has concluded that Lane's diabetes is under "extremely good control." Stipulated Facts at ¶ 30.

■ Third, the Defendants point out that the regulations also state that "no waivers will be granted for medical conditions which would prevent commissioning in at least a restricted status in the U.S. Navy Reserve." *Id.* § 310.56(d). However, this language directly conflicts with the Defendants' own interpretation of the META itself. The Defendants do not contest that the META allows for waiver upon a finding of hardship, and argue that these provisions apply directly to the requirement that all cadets meet armed forces reserve qualifications.[9] In this regulatory provision, however, the agency precludes the very waiver which the Defendants argue, and the Court agrees, Congress clearly set forth in 46 U.S.C.App. §§ 1295b(e)(2)–(3)(A).[10] Accordingly, the Court declines to bind itself to 46 C.F.R. § 310.56(d), as it is

unsupported by the META, while other regulatory provisions, which the Court shall follow, are consistent with the plain language of the META.

**D. Because the Court finds that the Defendants' alleged policy mandating the separation of Lane from the Academy upon discovery of his diabetes is not supported by the statute or its regulations, the Court shall not defer to the Defendants' espoused reading of the META.**

In *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 843, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694 (1984), the Supreme Court set forth the method by which federal courts shall review an agency's construction of a statute it administers:

> When a court reviews an agency's construction of the statute which it administers, it is confronted with two questions. First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. If, however, ... the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.

*Chevron,* 467 U.S. at 842–43, 104 S.Ct. at 2781–82 (footnotes omitted). The Supreme Court also noted that "[t]he judiciary is the final authority on issues of statutory construction which are contrary to clear con-

---

9. In particular, the Defendants state that "Congress recognized that hardship situations may develop in which a graduate may default on his or her maritime or military reserve obligations. Thus, Congress provided that '[i]n cases of hardship as determined by the Secretary [of Transportation], the Secretary may waive [the provision allowing defaulting graduates to be called to active duty service.]'" 46 U.S.C.App. § 1295b(e)(3)(A). "This provision ... provides authority for the agency to excuse a defaulting graduate's service obligations." Defendants' Opposition, at 15.

10. Technically, 46 U.S.C.App. § 1295b(e)(2)–(3)(A) applies to waive the punishment imposed by the META upon default, while 46 C.F.R. § 310.56(d) precludes the Superintendent of the USMMA from waiving physical prerequisites to obtaining a commission in the U.S. Naval Reserve upon application by an enrolled student. However, for purposes of the Court's analysis, the difference is not significant because the statutory language clearly affords waiver of the same physical requirements of which the regulation precludes waiver. The Court finds that Congress could not have intended this result.

gressional intent." *Id.* at 843 n. 9, 104 S.Ct. at 2782 n. 9.

■ The Defendants contend that the Court must defer to the agency's interpretation of the statute as requiring that all cadets meet the physical qualifications for commissioning in the armed forces reserve. The Plaintiff responds that the plain language of the statute, its purpose, and its history all demonstrate that Congress did not intend the rule the Defendants urge. Moreover, the Plaintiff argues that, under *Chevron,* this Court can determine Congress's intention by using traditional tools of statutory construction and, therefore, no agency deference is appropriate. Further, Lane asserts that little deference is due where, as here, the agency has been inconsistent in its interpretation of the statute. The regulation allowing waiver for hardship, as well as the USMMA's admission of students with other disabilities which disqualify individuals from commissioning in the naval reserve, belie the Defendants' claim that this is a long standing agency policy. In addition, the Plaintiff argues, the Defendants behaved inconsistently with respect to Lane's diabetes mellitus.

The Court finds that the matter may be determined under the first prong of the *Chevron* analysis because congressional intent is clear. Where congressional intent can be determined "by using 'traditional tools of statutory construction,' then that interpretation must be given effect." *Natural Resources Defense Council v. Reilly,* 983 F.2d 259, 266 (D.C.Cir.1993) (quoting *NLRB v. United Food & Commercial Workers Union,* 484 U.S. 112, 123, 108 S.Ct. 413, 420, 98 L.Ed.2d 429 (1987)). In the META, Congress expressly stated that cadets apply for and accept, if tendered, an appointment as a commissioned officer in the United States Naval Reserve, or another reserve unit of the armed forces. 46 U.S.C.App. § 1295b(e)(1)(D). The Court thus finds that Congress did not require that all cadets meet all physical requirements for such an appointment or lose their status as an enrolled student at the USMMA. Rather, Congress only expressly required that cadets "fulfill the requirements for a license as an officer in

the merchant marine of the United States...." *Id.* § 1295b(e)(1)(B).

■ Moreover, should the Court reach the second prong of *Chevron,* it need not adopt the Defendants' reading of the META because "the case for judicial deference is less compelling with respect to agency positions that are inconsistent with previously held views." *Pauley v. BethEnergy Mines, Inc.,* 501 U.S. 680, 698, 111 S.Ct. 2524, 2535, 115 L.Ed.2d 604 (1991). *See also I.N.S. v. Cardoza–Fonseca,* 480 U.S. 421, 446 n. 30, 107 S.Ct. 1207, 1221 n. 30, 94 L.Ed.2d 434 (1987) ("An agency interpretation of a relevant provision which conflicts with the agency's earlier interpretation is 'entitled to considerably less deference' than a consistently held agency view.") (quoting *Watt v. Alaska,* 451 U.S. 259, 273, 101 S.Ct. 1673, 1681, 68 L.Ed.2d 80 (1981)). Here, the relevant regulations repeat the "apply for" and "accept if tendered" language of the META itself, yet the Defendants now contend that its long standing policy has been that all students must meet the requisite physical requirements for a naval reserve commission. However, as discussed above, the Defendants concede that the USMMA has allowed students to graduate despite physical conditions which would disqualify them for a commission in the armed forces reserve.

Moreover, the agency displayed great inconsistency with respect to Lane's particular case. Although the Defendants stated in September of 1992 and April of 1994 that they were required to disqualify Lane from further studies at the Academy, at other times the Academy took a quite different position. In February of 1992, for example, although the Chief Medical Officer learned of Lane's condition and reported it to the Head of Naval Science at the Academy, Lane was allowed to remain at the Academy without any sanctions. Furthermore, in January 1993, the acting head of MARAD, Captain LeBack, officially placed Lane on "administratively approved absence" status rather than declaring him ineligible to continue at the Academy as a result of his diabetes mellitus, as the alleged *per se* rule would require. Captain LeBack's letter also conflicts with MARAD's earlier position in September of

1992 when it informed Lane that "diabetes is a disqualifying condition ... You are not eligible for appointment as midshipman, MMR/USNR nor for commissioning as a Naval Reserve Officer." Plaintiff's Motion for Preliminary Injunction, Exhibit 8 (memorandum from Krinsky to Lane dated September 21, 1992).

The Defendants respond that the USMMA did not know with certainty that Lane had diabetes mellitus until his father wrote to the Superintendent on July 23, 1992, advising him of that fact. Moreover, they explain that MARAD's Administrator, Captain LeBack, acted "[i]n reliance on statements of [Lane's] representatives that [Lane] ... could secure a reserve officer's commission." Defendants' Motion, at 8. In any event, they argue, the Academy physician's failure to implement USMMA policy cannot estop the agency from executing that policy when it learned with certainty that the Plaintiff had diabetes mellitus.

The Court is not persuaded by the Defendants' arguments on this issue. Not only did the Chief Medical Officer and Head of Naval Science refrain from enforcing the agency's alleged policy, but the acting head of MARAD himself entertained the possibility that Lane could remain at the Academy despite his affirmative diagnosis as having diabetes mellitus. If Lane's condition did so clearly warrant his disenrollment under the agency's policy, there would be absolutely no reason why the Head of MARAD would do anything but reiterate that rule and separate Lane from the Academy immediately and unconditionally. Moreover, Captain LeBack's alleged reliance on statements of Lane's representatives that Lane could secure a reserve commission undermines the Defendants' contention that reserve commissioning requirements were mandatory for all cadets and that diabetes was *per se* inconsistent with such standards, as MARAD expressly asserted in its letter of April 15, 1994. The Court finds that the Stipulated Facts show that the Academy did not consistently follow its allegedly clear and long standing policy, a conclusion which, in turn, sheds doubt on the clarity and longevity of the policy itself.

Accordingly, the Court finds that traditional tools of statutory construction reveal that congressional intent is clear: the META does not require that all cadets meet physical requirements for commissioning in the naval reserve or lose their enrollment status. As detailed above, the interpretation espoused by the Defendants in the instant matter runs contrary to the express language of the statute, which requires only that cadets apply for and, if tendered, accept a commission in the armed forces reserve. Moreover, the Defendants' position is inconsistent with its own regulations and past policy. Accordingly, the Court finds that the agency's action with respect to Lane is due no deference.

## II. THE COURT FINDS THAT THE DEFENDANTS VIOLATED SECTION 504 BY DISENROLLING LANE SOLELY ON THE BASIS OF HIS DIABETES MELLITUS

### A. The Defendants have not shown that meeting the physical qualifications for commissioning in the armed forces reserve is an essential program requirement of the USMMA.

 It is undisputed that Section 504 is violated if (1) the claimant has a disability; (2) he or she was denied participation in a federal program because of that disability; and (3) he or she was otherwise "qualified" for the program. *See Gallagher v. Catto,* 778 F.Supp. 570, 577 (D.D.C.1991), *aff'd,* 988 F.2d 1280 (D.C.Cir.1993). The issue in the instant case is whether the Plaintiff was otherwise qualified to remain at the USMMA.

 A qualified disabled person is one who meets all academic and non-academic qualifications that are "essential to participation in the program in question." *Southeastern Community College v. Davis,* 442 U.S. 397, 406, 99 S.Ct. 2361, 2367, 60 L.Ed.2d 980 (1979) (citation omitted). Further, even if the person *cannot* meet all essential qualifications, he is still "qualified" under Section 504 if reasonable modifications in the program will accommodate his disability. *School Board of Nassau County v. Arline,* 480 U.S. 273, 287 n. 17, 107 S.Ct. 1123, 1131 n. 17, 94 L.Ed.2d 307 (1987); *Davis,* 442 U.S.

at 408, 99 S.Ct. at 2368. Such accommodations are reasonable if they do not require a "fundamental alteration in the nature of [the] program" in question or if they pose "undue financial and administrative burdens." *Arline,* 480 U.S. at 287 n. 17, 107 S.Ct. at 1131 n. 17; *Davis,* 442 U.S. at 410, 412, 99 S.Ct. at 2369, 2370. The federal agency bears the burden of establishing that "further reasonable accommodation would present an undue hardship." *Catto,* 778 F.Supp. at 577–78. In addition, the Supreme Court has stressed that "in most cases" the question of whether a disabled person is qualified will involve an "individualized inquiry" and "appropriate findings of fact." *Arline,* 480 U.S. at 287, 107 S.Ct. at 1130. Thus a refusal to apply Section 504 to a class of disabled persons is lawful only where Congress has "specifically determined that no individualized inquiry [i]s necessary." *Traynor v. Turnage,* 485 U.S. 535, 551 n. 11, 108 S.Ct. 1372, 1383 n. 11, 99 L.Ed.2d 618 (1988).

■ Once again, the Defendants base their entire argument under Section 504 on the erroneous premise that Congress intended that all cadets meet the physical qualifications for commissioning in the armed forces reserve in order to remain at the Academy. The Defendants argue that, since commissioning in an armed forces reserve unit is, in their view, a statutory requirement for receiving an education at the USMMA, physical qualification for such a commission is necessarily an "essential" condition which must be satisfied. Because Lane cannot meet this essential program requirement, they reason, he is not otherwise qualified to complete his education at the USMMA. The Defendants further claim that exempting Lane from this general requirement would undermine the Academy's mission to provide trained reserve officers for military service. Because of the congressional mandate that cadets serve in, and qualify for, a reserve commission, the Defendants assert, such an accommodation would work a "fundamental alteration in the nature of the program." The Defendants therefore conclude that their actions with respect to Lane do not violate the Rehabilitation Act.

The Court cannot endorse the Defendants' position that continuous eligibility for the armed forces reserve is an essential program requirement under Section 504, or that attempting to accommodate Lane would result in undue hardship. As discussed above, the META in no way binds the Academy to the *per se* policy it purports to follow; rather, the statute merely requires cadets to apply for and, if tendered, accept a naval reserve commission, or a commission in another reserve unit of the armed forces. Moreover, the Defendants admit that such requirements, if any, do not even apply to students such as Lane who have not yet reached their third year. Consequently, the Defendants cannot simply point to that statute and definitively conclude that maintaining eligibility for such a commission is an essential requirement to remaining at the USMMA and that, therefore, their actions were consistent with Section 504.

In addition, the Court finds that, *aside from* pointing to the statute, the Defendants have not offered any explanation of how continuous eligibility for an armed forces reserve commission is an essential program requirement for purposes of Section 504. Rather, given that many people with diabetes have obtained merchant marine licenses, and at least 50 people with diabetes mellitus are currently operating under a merchant marine license at sea, the Court finds that the rigid naval reserve requirements are not "essential" to at least one purpose of the program, namely, training officers for the merchant marine.

Further, even if producing people for military reserve service were an equally important purpose under the META, the Court finds that purpose is fully satisfied without Lane through the Academy's graduation of the many other cadets who do not have diabetes. Indeed, it is undisputed that a large portion of these graduates never enter the reserve. As counsel for the Plaintiff have observed, if the situation at hand arose in a time of war, or if the Defendants could demonstrate a recognition by Congress that the supply of reserve troops was sorely insufficient when Lane was disenrolled, the Defendants' argument under Section 504 might

have some merit. But here, the Defendants concede that they can "only speculate" as to the impact of allowing Lane to graduate. Defendants' Opposition, at 28. The Defendants have made no showing that the reason for separating Lane from the Academy was essential to the program at all.

### B. The Defendants have not even attempted to make reasonable modifications in the program to accommodate Lane's disability.

 Moreover, even if cadets' continuous eligibility for an armed forces reserve commission were an essential program requirement, the agency carries the burden of showing that it could not reasonably accommodate Lane's disability. *Gallagher v. Catto*, 778 F.Supp. at 577–78. The Defendants argue that any accommodation would require a fundamental alteration in the nature of its program because the physical eligibility requirement for an armed forces reserve commission is mandated by the META.

It is undisputed that, aside from his diabetes, Lane is extremely well qualified to complete his education at the USMMA. Moreover, in Lane's case, he developed the disease after enrolling in the Academy, and he has maintained an excellent record with respect to both academic *and* physical testing. This is not a case of an applicant challenging the Academy under Section 504. Rather, Lane was an enrolled student, who was fully qualified upon application, and who made a serious investment in the USMMA and in his future following his education there. In turn, the government, through tax-payer dollars, also made an investment in his training and, as Lane's record shows, their investment was a good one. It is undisputed that, if Lane continues to control his diabetic condition, he will make a fine merchant marine officer.

Accordingly, the Court finds that the Defendants have made no showing under Section 504 that the Academy cannot provide reasonable accommodation for Lane's condition. Such accommodation, as far as the Court can tell from the record before it, would amount to simply allowing Lane to graduate. Those most familiar with Lane's

abilities and control over his diabetes confirm that he could complete his education and training at the Academy with little or no difficulty. Plaintiff's Motion for Preliminary Injunction, Exhibit 10 at 1 (medical evaluation letter by Dr. Mark Tanen); Exhibit 15 at ¶¶ 5, 7 (Declaration of Commander Joseph Gebhard). Moreover, the Defendants admit that, in their view, such accommodation may be made for third and fourth year students under the regulations addressing the statute's waiver provisions, and they admit that the Academy has allowed students in the past with a lost limb, a lost eye, brain damage, and color blindness to remain at the Academy and graduate despite their disabilities. The Court cannot conceive of any reason why accommodating Lane would, in contrast, cause the Academy grievous injury. Moreover, Lane developed the disease after he enrolled. Thus a finding that the Academy's act of separating Lane from the USMMA after he discovered he had diabetes mellitus would not necessarily impact the Academy's admission standards.

Moreover, to the Court's knowledge, Lane has not asked to be excused from participating in any of the USMMA's academic or physical programs as a result of his condition. Thus nothing further than allowing Lane to complete his courses of instruction along with every other student would be required to accommodate him under Section 504. The Defendants have not demonstrated where the alleged undue hardship would lie in this event. It is true that the Court's holding, depending on the facts of the case, might preclude the Academy from disenrolling future students who, after they enroll, develop a physical condition inconsistent with requirements for a naval reserve commission, yet meet all other program requirements. But the Defendants have not persuasively shown that accommodating such students would result in undue hardship. Indeed, the Defendants concede that, in cases of colorblindness, a lost limb, a lost eye, and brain damage, the Academy has accommodated students and allowed them to graduate. Accordingly, the Court finds that no undue hardship will result from allowing Lane to graduate and become a merchant marine offi-

cer. Indeed, the Court observes that the government will likely benefit greatly from his service.

### C. The Court finds that the Defendants erred in failing to make an individualized inquiry into the particular facts of Lane's case.

 The Court further finds that the Agency erred in failing to make an individualized inquiry into the particular facts of Lane's case. *See School Board of Nassau County v. Arline,* 480 U.S. 273, 287, 107 S.Ct. 1123, 1130–31, 94 L.Ed.2d 307 (1987). The Defendants argue that such an individualized inquiry was unnecessary because an "'individualized inquiry' need be no more extensive than the facts of the case demand." *Carr v. Reno,* 23 F.3d 525, 530 (D.C.Cir.1994). Here, they argue that the Academy's inquiry ended with Lane's disqualification under the blanket rule requiring cadets to meet reserve service requirements. At oral argument, the Defendants also relied upon *American Hosp. Ass'n v. N.L.R.B.,* 499 U.S. 606, 611–12, 111 S.Ct. 1539, 1543, 113 L.Ed.2d 675 (1991) (*AHA* ), for the proposition that an agency may establish rules of general applicability to guide its discretion in making the individualized determinations required by a particular statutory scheme.

Because the Court finds that the META does not impose a requirement that all students meet eligibility standards for commissioning in the armed forces reserve, the Court determines that the facts of Lane's case did demand a more thorough inquiry than simply confirming that he had diabetes mellitus. Moreover, the Court observes that the Defendants erred in creating a blanket restriction absent a specific determination by Congress that such restriction is necessary. *See Traynor v. Turnage,* 485 U.S. 535, 551 n. 11, 108 S.Ct. 1372, 1383 n. 11, 99 L.Ed.2d 618 (1988).

Finally, the Court further finds that *AHA* does not address the authority of federal agencies to interpret Section 504 of the Rehabilitation Act and, therefore, does not relieve the Defendants of the individualized inquiry requirement under Section 504. Defendants reply that the case affords the De-

fendants discretion in determining whether, and under what circumstances, a hardship exception to the requirements of the META shall be made. The Defendants state that the agency's decision to accommodate hardship cases only after cadets begin their third year is "eminently reasonable, since midshipmen do not incur a service obligation until their junior year." Defendants' Response to Plaintiff's Supplemental Memorandum in Response to New Authority Cited by Government at Oral Argument, at 4.

The Court declines to make any findings regarding whether *AHA* entitles the Defendants to make blanket rules to guide their decisions regarding whether to waive the express requirements of the META upon a showing of hardship. Rather, the Court need not reach that question given its finding that the META does not require cadets to be commissionable in the armed forces reserve throughout their education. In short, with respect to Lane's condition, there is no statutory rule to waive. Similarly, even in the Defendants' view, Lane did not even incur a service obligation while at the USMMA and, therefore, "he was not eligible for a waiver." *Id.* Thus the waiver provisions have no bearing on the Defendants' duty to conduct an individualized inquiry into the facts of Lane's situation. Thus the Court finds that the Defendants have not demonstrated that Congress has absolved the DOT of assuring that students at the USMMA will receive individualized determinations and reasonable accommodation under Section 504.

In sum, the Court finds that the Defendants have violated Section 504 of the Rehabilitation Act by separating Lane from the Academy based solely on his diabetes mellitus. In particular, the Court finds that meeting physical requirements for commissioning in the naval reserve is not an essential program requirement. Even if it were essential, however, the Court holds that the Defendants have not met their burden of showing that providing reasonable accommodation would result in undue hardship for the USMMA and, further, that the Defendants erroneously failed to make any individualized inquiry into the facts of the Plaintiff's case.

**III. THE COURT FINDS THAT THE PLAINTIFF IS ENTITLED TO REINSTATEMENT TO THE ACADEMY FORTHWITH AND TO COMPENSATORY DAMAGES UNDER SECTION 504**

"It is well-established that injunctive and declaratory relief are available under the Rehabilitation Act." *Doe v. District of Columbia,* 796 F.Supp. 559, 573 (D.D.C.1992) (Hogan, J.).[11] In light of its finding that the Defendants violated Section 504 of the Rehabilitation Act, the Court shall therefore order the Defendants to reinstate Lane to the Academy forthwith, and to take all steps necessary to permit Lane to resume his maritime training.

The parties remain in dispute, however, over whether the Plaintiff may recover compensatory damages against the government under Section 504 of the Rehabilitation Act.[12] For the following reasons, the Court finds that the Plaintiff, as the prevailing party, is entitled to compensatory damages under Section 504.[13]

With respect to actions against private parties and local counties, the Defendants do not contest the conclusion that, "based on the Supreme Court's recent decision in *Franklin v. Gwinnett County Public Schools,* 503 U.S. 60, 112 S.Ct. 1028, 117 L.Ed.2d 208 (1992),

compensatory damages are available under the Act." *Doe,* 796 F.Supp. at 571.[14] *See also Tanberg v. Weld County Sheriff,* 787 F.Supp. 970, 972 (D.Colo.1992) (*Franklin* "provides dispositive analysis" for determining whether compensatory damages are recoverable under the Rehabilitation Act); *Kraft v. Memorial Medical Center,* 807 F.Supp. 785, 790–92 (S.D.Ga.1992) (compensatory damages recoverable under section 504); *Consolidated Rail Corp. v. Darrone,* 465 U.S. 624, 637, 104 S.Ct. 1248, 1256, 79 L.Ed.2d 568 (1984) (plaintiffs may recover backpay under section 504). Rather, the Defendants assert primarily that the doctrine of sovereign immunity protects them from a damages suit for violation of Section 504, and contend that the Rehabilitation Act only affords a cause of action against private agencies. The Court cannot agree.

In the 1978 Amendment to the Rehabilitation Act, Congress specifically extended the Act's discrimination prohibition to "any program or activity receiving Federal financial assistance or any program or activity conducted by any Executive agency...." 29 U.S.C. § 794. Prior to this amendment, Section 504 only prohibited handicap discrimination by private federal aid recipients.

In *Doe v. Attorney General,* 941 F.2d 780 (9th Cir.1991), the Ninth Circuit held that

---

**11.** Section 504 specifically entitles a prevailing party to petition the Court for "a reasonable attorney's fee as part of the costs." 29 U.S.C. § 794a(b).

**12.** As both parties observe, no federal court in a published decision has addressed the forms of relief, if any, available to a prevailing plaintiff under the META. Plaintiff's Motion, at 30 n. 64; Defendants' Opposition, at 29. Thus both sides analyze Lane's entitlement to damages under Section 504 only. As the Court finds that the Defendants have violated Section 504, and as neither party has presented for decision the issue of whether the Plaintiff is entitled to recover damages under the META, the Court shall confine its discussion to the damages principles arising under the Rehabilitation Act.

**13.** The Plaintiff seeks three components of compensatory damages, including (1) out-of-pocket expenses that Lane and his family incurred to procure an alternative college education for Lane after he was disenrolled from the USMMA; (2) loss of professional opportunity damages due to

the delay of Lane's entry into his chosen career as a merchant marine officer; and (3) damages for pain and suffering. The Court declines to rule at this time on the appropriate components of damages Lane may recover.

**14.** In *Franklin,* the Supreme Court held that compensatory damages are available under Title IX of the Educational Amendments of 1972, 20 U.S.C. §§ 1681–1688 ("Title IX"), which bans sex discrimination in educational institutions that receive federal funds. Although the Court acknowledged that Title IX was silent on the availability of remedies, it found that the its "reading of the two amendments to Title IX ... lead[ the Court] to conclude that Congress did not intend to limit the remedies available in a suit brought under Title IX." *Franklin,* 503 U.S. at ——, ——, 112 S.Ct. at 1035, 1036. The Supreme Court thus concluded that "a damages remedy is available for an action brought to enforce Title IX," as the Court "presume[d] the availability of all appropriate remedies unless Congress has expressly indicated otherwise." *Id.* 503 U.S. at ——, ——, 112 S.Ct. at 1038, 1032.

the language and history of the 1978 Amendment reveal Congress's intent, "unequivocally expressed," "to put the federal government on equal footing with everyone else in making it subject to Section 504's prohibition of discrimination against the handicapped." *Id.* at 789, 792. Accordingly, the Court found that "Congress waived sovereign immunity and provided a private right of action for damages for discrimination claims against the United States under section 504 of the Rehabilitation Act." *Id.* at 799.

In *Doe,* a physician with Acquired Immune Deficiency Syndrome brought a Rehabilitation Act suit against the government when the Federal Bureau of Investigation ceased having its agents examined at the plaintiff's clinic, as had been its practice pursuant to an annually renewed procurement contract between the FBI and the clinic. The FBI argued that sovereign immunity cloaked them from suit under Section 504. In rejecting that claim, the Ninth Circuit reviewed the Amendment's legislative history in detail, and explained that, although "the [congressional] debates do not state outright that section 504 subjects federal agencies to private actions for money damages, they nevertheless unequivocally express Congress's intent to do precisely that." *Id.* at 792–93. Moreover, the Court observed that, at the time of the 1978 Amendment, Congress was aware that the courts had interpreted Section 504 to create a private right of action for victims of discrimination. *Id.* at 789–90. Thus it concluded that, because "Congress appended the new coverage to the end of the pre-existing sentence under which a private cause of action had been implied," congressional intent "that there be no distinction in [the statute's] enforcement against federal defendants" is evident. *Id.* at 790. In *J.L. v. Social Sec. Admin.,* 971 F.2d 260, 270 (9th Cir.1992), the Ninth Circuit affirmed its holding in *Doe.*

Persuaded by the Ninth Circuit's reasoning, the Court finds that Plaintiff Lane is entitled to recover compensatory damages against the Defendants. In particular, the Court finds that Congress's 1978 extension of the Rehabilitation Act to programs or activities conducted by Executive agencies demonstrates that Congress intended to make federal agencies such as the DOT liable for money damages stemming from discrimination against the handicapped in their programs.

In *Dorsey v. United States Dep't of Labor,* Civil Action No. 88–1898 (D.D.C. Feb. 10, 1993), *appeal filed,* Dk. No. 93–5080 (D.C.Cir. 1994), Judge Hogan found that, although the plaintiff's reading of Section 504 was a plausible one, Congress has not expressly authorized a damages remedy against the federal government under the Rehabilitation Act. With all due respect, the Court finds this position erroneous. Section 504 of the Rehabilitation Act prohibits discrimination under any program or activity that receives federal financial assistance. Because the 1978 amendments to Section 504 expressly extended the Act's discrimination provision to programs receiving federal financial assistance, the conclusion is inescapable that Congress contemplated that the federal government would be on "equal footing with everyone else" who discriminates against the handicapped. *Doe,* 941 F.2d at 792. The Court finds no reason to conclude that Congress intended to exclude rights or remedies as against the federal government when it gave the courts broad authority to enforce its statutory provisions requiring reasonable accommodation for the handicapped.

## CONCLUSION

The Court concludes that the Defendants' actions with respect to Plaintiff Lane were not justified by the META or the regulations promulgated thereunder. Moreover, the Court finds that, based on the language of the statute, the regulations, and the USMMA's inconsistent actions with respect to Lane as well as other disabled students, the Court need not defer to the agency's reading of the META as requiring Lane's ultimate disenrollment solely because of his diabetes mellitus.

In addition, the Court finds that the Defendants violated Section 504 of the Rehabilitation Act in separating Lane from the Academy, as they have failed to show that meeting the physical qualifications for commissioning in the armed forces reserve is an

essential program requirement of the USM-MA, they have not even attempted to make any reasonable accommodations for Lane's disability, and they failed to make an individualized inquiry into the particular facts of Lane's case. Finally, the Court finds that the Plaintiff is entitled to reinstatement forthwith as a student at the Academy, and that the Plaintiff is entitled to compensatory damages against the Defendants, as Congress has waived sovereign immunity to damages for discrimination claims under Section 504.

Accordingly, the Court shall grant the Plaintiff's Motion for Summary Judgment, deny the Defendants' Motion to Dismiss or, in the alternative, for Summary Judgment, and enter judgment for the Plaintiff. The Court shall further order the Defendants to reinstate Lane as soon as practicable, and shall schedule a status conference, pursuant to Rule 16 of the Federal Rules of Civil Procedure, to set forth the framework for the just and speedy resolution of any outstanding issues with respect to damages.

### ORDER

Upon consideration of the parties' cross-Motions for Summary Judgment, the applicable law, the oral arguments of counsel, the entire record, and for all of the reasons articulated in this Court's Memorandum Opinion issued of even date herewith, the Court finds that the Plaintiff's Motion for Summary Judgment shall be granted, and the Defendants' Motion to Dismiss or, in the alternative, for Summary Judgment shall be denied. The Court shall therefore direct that judgment be entered for the Plaintiff, and shall order the Defendants to reinstate forthwith the Plaintiff as a student at the United States Merchant Marine Academy, and to allow the Plaintiff to resume his maritime training as soon as practicable.

Further, the Court has determined that a status conference shall be scheduled, pursuant to Rule 16 of the Federal Rules of Civil Procedure, at which the parties shall be prepared to address the framework for the just and orderly resolution of any outstanding issues regarding damages.

Accordingly, it is, by the Court, this 26 day of October, 1994

ORDERED that the Plaintiff's Motion for Summary Judgment shall be, and hereby is, GRANTED, except as to the amount of damages and costs; and it is

FURTHER ORDERED that the Defendants' Motion to Dismiss or, in the alternative, for Summary Judgment shall be, and hereby is, DENIED; and it is

FURTHER ORDERED that judgment shall be, and hereby is, ENTERED in favor of the Plaintiff on the issue of liability; and it is

FURTHER ORDERED that the Defendants shall reinstate Plaintiff Lane as a student at the United States Merchant Marine Academy forthwith and shall take all steps necessary to ensure that Plaintiff Lane resumes his maritime training at the Academy as soon as practicable; and it is

FURTHER ORDERED that counsel for both parties shall appear before the Court at 11:00 on November 16, 1994, for a status conference, to be held pursuant to Rule 16 of the Federal Rules of Civil Procedure, at which the parties shall be prepared to discuss the framework for the just and orderly resolution of any outstanding issues regarding damages.